LUCAS *v.* WILLIAMS

[No. 37, September Term, 1958.]

*Decided December 12, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Harry S. Shapiro* for the appellant.

*Philip V. Hendelberg* and *Eugene A. Alexander, III,* for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

Andrew Charles Lucas appeals from a decree of the Circuit Court for Baltimore City which held that he was the natural father of three children, and denied the prayer of his petition for a "change or modification" of a previous order

that directed him to pay thirty dollars, per week, for the children's support.

The appellant and the natural mother of the children were married in 1942 and resided in Baltimore until 1952, when they moved to Georgia. In 1944, the husband and wife sought the medical advice of Dr. Haswell D. Franklin concerning the fact that they had been unable to procreate any children.

A letter from Dr. Franklin was introduced in evidence by stipulation of counsel. This letter stated that Lucas gave a history of "having had orchitis due to mumps as a child" and claimed that his physician at that time told him he was sterile; that Dr. Franklin examined the appellant's spermatic fluid on December 3, 1944, and the Doctor "found that he [the appellant] was sterile"; and that, on January 28, 1958, Dr. Franklin referred Lucas to a Dr. Councill for fertility examination and "his investigation indicates that Mr. Lucas is sterile." It will be noted that more than thirteen years transpired between the two examinations.

The wife bore three children during the time the couple were living together: one was born on December 19, 1951; one on August 16, 1953; and the other on November 28, 1954. Thus it is seen that the first child was born seven years after Dr. Franklin's examination; the last more than four years before that of Dr. Councill.

During the course of their marriage, the wife was convicted of prostitution, and served about five months for the offense. The record extract fails to disclose the date of this conviction. However, the husband knew of it, but continued to live with the wife. Also during the marriage, the wife made several rather extended visits to her home in Georgia, while her husband remained in Baltimore.

In 1956, the wife obtained a divorce from the appellant in Georgia and has since remarried.

In October of 1956 certified copies of proceedings from a proper Court in Georgia under the Uniform Reciprocal Enforcement of Support Act [Code 1957, Article 89C] were forwarded to the Court in Baltimore City, Domestic Relations Division. On November 7, 1956, upon the petition of the

State's Attorney, the appellant *assented* to an order directing him to pay for the support and maintenance of his three children. Thereafter, the husband petitioned for a "change or modification" of the order, but the chancellor, after a hearing, found that he was the natural father of the three children, dismissed his petition and referred the matter to the Probation Department of the Supreme Bench.

The mother of the children testified at the hearing that the appellant was the father of all three of them.

The appellant's first and principal claim is that the chancellor erred when he found as a matter of fact that the appellant was the natural father of the three children. He argues that he presented sufficient evidence to overcome the presumption of legitimacy. In order to determine whether this ruling of the chancellor was "clearly erroneous" (Maryland Rule 886 a), we must examine the nature of the presumption and the character, strength and weight of the evidence offered to rebut it.

A child, conceived after the marriage of its parents and born to those parents during their marriage as was the case of each child involved herein, is presumed by the law to be legitimate. The histories of this presumption and the related subject, the Lord Mansfield rule, have been stated by this Court on several occasions; so they will not be repeated here. *Hale v. State,* 175 Md. 319, 2 A. 2d 17; *Dayhoff v. State,* 206 Md. 25, 109 A. 2d 760; *Clark v. State,* 208 Md. 316, 118 A. 2d 366. In the *Clark* case, it was stated that where conception and birth both occur during wedlock the presumption is "a very strong" one. See also the *Dayhoff* case, *supra,* at page 31. In *Hale, supra,* 175 Md. at page 322, it was said that the presumption of legitimacy is not to be rebutted by circumstances which only create "doubt or suspicion"; but it may be entirely removed by *proper* and *sufficient* evidence that the husband was "incompetent." There are also listed three other classes of testimony that may be offered to rebut the presumption, none of which is germane to the issues in the case at bar.

The facts and the law having established this "very strong" presumption of legitimacy, we turn to the character, strength

and weight of the evidence offered by the appellant to rebut the same. He relies entirely upon the letter of Dr. Franklin and the fact that his wife was convicted of prostitution sometime during their marriage. Dr. Franklin's letter stated that he found that the appellant was "sterile" in 1944, some seven years before the birth of the first child. There is no explanation as to just what Dr. Franklin meant by "sterile," but we shall accept, for the purposes of this case, that the Doctor meant that in his opinion the appellant was incapable of being a father of a child in 1944, and was, therefore, "incompetent" at that time. Cf. *Hughes v. Hughes,* 271 P. 2d 172, 175 (Cal.). However, the Doctor failed to express any opinion as to whether a man, who is sterile on a particular date, remains sterile for any particular time, or permanently; nor did he express any opinion as to whether the appellant could be the father of the children; and there was no other medical evidence on either subject.

Dr. Franklin's letter also stated that he referred the appellant to Dr. Councill for fertility examination in 1958, four years after the birth of the last child, and his investigation "indicates" that the appellant is sterile. This does not constitute even an affirmative opinion by Dr. Councill that the appellant was sterile at the time of this investigation. The word "indicate" means: "[T]o give a suggestion of, as something that may occur in the future; give reason to expect * * *. * * * *Med.* To show or suggest by symptoms (the disease or its remedy) * * *."[1] This evidence failed to give the court the advantage of the extent of Dr. Councill's investigation, what he meant by the word "indicates," or any expression of the Doctor's opinion as to whether the appellant was capable of being a father at the time of his investigation.

Without further enlightenment from proper medical sources, it is impossible for us to say that the chancellor was "clearly erroneous," although it, perhaps, could be conceded that the Doctor's letter and the wife's loose conduct raise doubt and suspicion as to whether the appellant is the father of the

---

1. Funk and Wagnalls, *New Standard Dictionary of the English Language.*

children, which this Court, in the *Hale* case, *supra,* said was insufficient to overcome the strong presumption of legitimacy. As a matter of fact, it does not seem certain that the medical profession is in complete agreement concerning the subjects being discussed. In Schatkin, *Disputed Paternity Proceedings,* (3rd Ed.), we find the following:

"The science of male reproduction is not in the same category as blood tests. There is, it seems, an element of scientific controversy in this field and the matter is to a certain extent the subject of experts' conflicting opinions. Furthermore, on the subject of male fertility we are dealing with astronomical figures. For example, the average volume of the human ejaculate is 3 cc. with a spermatozoon count per cc. of 120.5 million. Inasmuch as the average number of spermatozoa is 100 to 150 million per cc. and the total ejaculate varies from 3.5 to 6 cc. it follows, therefore, that the total ejaculate should contain 350 to 500 million spermatozoa. Amounts less than 60 million spermatozoa per cc. are less likely to cause pregnancy. In fact, evidence has been furnished by other scientists who believe that pregnancy is not likely to occur with spermatozoa counts below 60 million per cc.

"The likelihood of sterility is progressively greater the lower the spermatozoon count. Below 60 million a man would be relatively infertile. But when one considers that only a single spermatozoon actually impregnates the ovum, the only absolute proof of sterility is absence of testicles or complete absence of spermatozoa from the semen due to atrophy or disease of the testicles or blockage of the vas deferens, the tube through which the spermatozoa are excluded.

"If the defendant raises the defense of sterility, it must be based upon an examination of his seminal fluid by a scientific expert in the field of male reproduction, to determine the presence or absence of

motile spermatozoa. It is not necessary that there should be found a complete absence of spermatozoa because according to the weight of scientific authority, a count of spermatozoa below 60 million per cc. indicates low fertility. If the expert testifies to a state of sterility on the date of the examination, that testimony is not sufficient. The expert must give his opinion as to how long that condition existed and, specifically, whether it existed on the date of the alleged act of intercourse."

And in Gonzales, Vance, Helpern and Umberger, *Legal Medicine Pathology and Toxicology,* (2nd Ed.), 617, it is stated: "Normally, the male becomes fertile at the age of 14 to 16 years, and fertility may last until the age of 70 or 80 years. Each case must be decided individually, and it may be said that as long as live spermatozoa are present in the seminal fluid, the individual must be presumed to be fertile." As stated above in the absence of more certain and conclusive evidence upon the subject, we are not disposed to hold the chancellor was clearly wrong in decreeing that the appellant was the father of the children. '

The appellant also complains that the chancellor committed error in refusing, under the authority of Maryland Rule 420, to require the mother to submit to blood tests. The request for the chancellor to direct the mother to submit to blood tests was made, for the first time, at the hearing upon the conclusion of the taking of the oral testimony. Counsel representing the interests of the children objected on the grounds that the mother was from out of the State and had been "up here for a week trying to get a hearing," and that the taking of blood tests might incriminate her. We do not reach the question as to whether the latter ground was a sufficient reason for denying the request and leave the matter open. Maryland Rule 420 is under the general heading of "Depositions and Discovery" and provides that under certain conditions the court "may," for good cause shown, order a "party" to submit to a mental, physical or blood examination. In the manner of the course and conduct of a trial, especially in the

taking of depositions and the requiring of tests after the hearing has commenced, reasonable latitude must be placed in the sound discretion of the trial judge, and, in the absence of an abuse of that discretion, his rulings will not be disturbed. We feel as did the Court in the case of *Adams v. District of Columbia,* 109 A. 2d 140 (D. C.), where it was held that the denial of a similar request was no abuse of discretion when made upon motion for a new trial.

Having arrived at this conclusion, it is unnecessary to consider the additional point raised by the appellee.

*Decree affirmed, with costs.*