[L. A. No. 27702.   In Bank.   May 25, 1966.]

TERRY HUNTINGDON et al., Plaintiffs and Appellants, v. ARTHUR CROWLEY, Defendant and Respondent.

648

[redacted]

Howard M. Redlich and Sydney M. Williams for Plaintiffs and Appellants.

Arthur Crowley, in pro. per., Crowley & Goffin and Ron Swearinger for Defendant and Respondent.

MOSK, J.—This is an appeal from a judgment entered upon a jury verdict for defendant in a paternity suit. (Civ. Code, §§ 196a, 231.)

The initial question presented is whether the trial court abused its discretion in declining to admit medical testimony based on a system of blood grouping that was still in the experimental stage at the time it was offered; we answer this question in the negative. The second principal issue is whether the court committed prejudicial error in instructing the jurors, in effect, that their verdict must be for defendant if they find plaintiff had a mere association and opportunity to have sexual intercourse with other men during the probable period of conception; we answer this crucial query in the affirmative, and accordingly reverse the judgment.

In August 1961 Terry Huntingdon, an unmarried woman, learned she was pregnant. After her attempts to obtain an abortion failed or were abandoned, she filed this action against defendant. In her amended complaint Terry alleged that she and defendant engaged in numerous acts of sexual intercourse between May 1, 1961, and August 30, 1961, and that during such period she had no intercourse with any person other than defendant. In his answer defendant admitted having intercourse with Terry in the month of May 1961, but denied any such acts after that date and denied being the father of the child. Defendant also denied Terry's allegation that she had intercourse with none but him between May and August, and alleged rather that during such period Terry "engaged in acts of sexual intercourse with various men including, but not limited to, executives in the motion picture and television industries. . . ."

Lengthy discovery procedures were then undertaken. The child, a girl of normal size and weight, was born on May 14, 1962.[1] In his statement of contentions set forth in the pretrial conference order defendant reiterated his allegation that between May and August of 1961 Terry engaged in acts of sexual intercourse with persons other than himself, "and that one of said persons, other than defendant, is the father of said child." In particular, defendant named Alvin Ganzer, a television director, and Brett Wright, Terry's hairdresser, as men with whom she had sexual intercourse before, during, and after the conception period.

At the trial[2] it developed that Terry's last menstrual period began on July 21 or 22, 1961, and continued for several days. Obstetrical evidence established the outer limits of the possible period of conception as July 26 to August 7. Terry admittedly had a violent argument with defendant on July 22 and did not see him again until August 2. For defendant to be the father of the child, therefore, conception must have occurred between August 2 and August 7. Terry testified that she engaged in

---

[1] The child was joined as a plaintiff. Prior to the start of trial Terry moved to be dismissed as a party plaintiff, remaining in the case only as guardian ad litem of the child; the motion was granted over defendant's objection. For convenience, however, we shall continue to refer to Terry and the child as the plaintiffs, for Terry is a party to this appeal, seeking reversal of an order denying her motion to tax costs.

[2] The trial and hearing on post-trial motions lasted over eight weeks, and the proceedings are recorded in a shelf of 13 volumes of transcript. Only those portions of the lengthy record necessary for an understanding of the principal points of the appeal will be summarized here.

acts of sexual intercourse with defendant on August 2, 3, and 5. Defendant, on the other hand, denied any such acts. He testified that he allowed her to visit him briefly on the evening of August 2 to watch a television show that she was in, since she had no television set in her apartment, but that throughout the evening his two children, his two servants and their child, were also present in the house; that on August 3 he did not see Terry at all; and that on August 5 he accompanied Terry at her request to a dinner party given by friends of hers, but had another violent argument with her on the way home and dropped her off outside her apartment. The jury's decision thus turned, as is not uncommon in cases of this kind, largely upon the credibility of the two principals.

Both in her depositions and in her direct testimony, moreover, Terry stated that throughout this affair, i.e., from May to August 1961, she was "going steady" with defendant. On cross-examination and by independent witnesses defendant proved, on the contrary, that during this same period Terry dated a large number of other men; in particular, both Terry and Brett Wright admitted on the witness stand that on July 27 and 28 they spent two nights together, alone in a house in West Los Angeles even though each had an apartment a relatively short distance away.

Not only did the latter fact tend to impeach Terry's assertions of steadfast devotion to defendant, it also constituted affirmative evidence, when taken in conjunction with other testimony, pointing to Wright as the father of the child.[3] Terry's former roommate, Nancy Sandack, testified by deposition that in March 1961 Terry had admitted having sexual intercourse with Wright. Furthermore, certain obstetrical evidence based on Terry's menstrual cycle, her complaints of nausea beginning August 3, and the condition of her uterus when pregnancy was diagnosed on August 28, pointed to conception actually having occurred between July 27 and 31, 1961. As just noted, during these crucial days Terry admittedly did not see defendant but did spend two nights in the company of Wright.

Ganzer was likewise implicated as the possible father of the child, although somewhat less directly. Nancy Sandack

---

[3]Throughout the trial and appeal counsel for defendant seems to have labored under the misconception that, merely because Terry had been dismissed as a party plaintiff, such evidence was admissible for the sole purpose of impeaching her testimony. On the contrary, it was also admissible—and the jurors apparently so understood it—to prove affirmatively that someone other than defendant was the child's father.

deposed that while making a television film in February 1961 with Ganzer as director, Terry did not sleep in her room and later admitted having slept with Ganzer and having sexual intercourse with him. On July 28, before returning for the night to the house she shared with Wright, Terry spent the evening until midnight at Ganzer's apartment. On August 12, i.e., within the period Terry was assertedly "going steady" with defendant, she telephoned defendant and stated she had been "balling it up all last night" with Ganzer, and had remained with him at his apartment until 6:30 the following morning. When the fact of her pregnancy was discovered Ganzer bought Terry an airplane ticket to go to Mexico City to have an abortion, supplied her with the name of an abortionist, and gave her $600 to pay for the operation.

██ In a disputed paternity proceeding, of course, the burden of proving the defendant to be the father of the child is on the plaintiff; but such proof need only be by a preponderance of the evidence, and the unsupported testimony of the mother is sufficient for this purpose. (*Berry* v. *Chaplin* (1946) 74 Cal.App.2d 652, 661, [169 P.2d 442].) As has been well said by one of the leading authorities in this field, "It is easy for a woman to bring the charge that a man is the father of her child. It is not quite as easy for her to substantiate the charge. But it will be difficult for the defendant to disprove the charge." (Schatkin, Disputed Paternity Proceedings (3d ed. 1953) p. 472.) In the emotional atmosphere generated in the courtroom by the spectacle of the unwed mother and the unwanted baby, it will often not be enough for an unjustly accused man to simply deny paternity, especially when, as here, he concededly has had sexual intercourse with the mother at an earlier date. ██ To aid in reestablishing this balance the law therefore allows the defendant to introduce evidence that the mother had sexual intercourse with another man or other men during the period in which, in the ordinary course of nature, the child must have been conceived. (*Mensing* v. *Croter* (1930) 209 Cal. 318, 320 [280 P. 1026, 287 P. 336]; *Berry* v. *Chaplin* (1946) *supra*, 74 Cal.App.2d 652, 662.)

The first major question presented by this case is how far the complainant should be allowed to go in rebutting the inferences raised by such evidence of sexual intercourse with other men. Obviously some limit must be declared, or the proceedings will quickly degenerate into a series of paternity trials of each of the other men thus drawn into the case. The Uniform Act on Blood Tests to Determine Paternity (Code

Civ. Proc., §§ 1980.1-1980.7) is not clear on this point.[4] Some guidance is to be found in the basic command of section 1980.3 that upon proper and timely request the trial court "shall order the mother, child and *alleged father* to submit to blood tests." (Italics added.) Taken in its context, the phrase "alleged father" appears to mean the man actually charged by the complainant with being the father of her child, rather than any other man later injected into the case to cast doubt on the verity of her accusation. On the other hand, the code does not expressly exclude blood tests of the latter group of men, and such evidence has been admitted both in California courts (*Foster* v. *Gray* (1962) 203 Cal.App.2d 434, 436 [21 Cal.Rptr. 429]) and elsewhere (*Thompson* v. *Scavo* (1959) 8 App.Div.2d 652 [185 N.Y.S.2d 47]).

In any event, it bears repeating that a request for an order to take blood tests must be timely. Section 1980.3 specifies that such a motion must be "made at a time so as not to delay the proceedings unduly. . . ." In their prefatory note to the corresponding section of the uniform law, the commissioners explain that the motion is to be made "a reasonable time *before* the case is reached for hearing. What is a reasonable time is left to the discretion of the trial court. The purpose of an early application for the test is to permit the results of the test to become known *prior to the trial.* . . . It would also permit the taking of additional tests if there was any claim as to the inaccuracy of the one given. . . . The provisions in the Act leave it to the discretion of the court as to what constitutes reasonable time, taking into consideration the facilities for examination." (Italics added.) (9 U.L.A., p. 108.) Here as early as the pretrial conference order there was no doubt as to defendant's charge that Ganzer and Wright, among others, had sexual intercourse with Terry during the conception period; yet counsel for plaintiffs made no motion for blood tests of these two men until the very end of the trial, after the defense had rested. On this ground alone the motion could well have been denied. (Cf. *Lucas* v. *Williams* (1958) 218 Md. 322 [146 A.2d 764, 767] [motion made at close of oral testimony]; *Dale* v. *Buckingham* (1949) 241 Iowa 40 [40 N.W.2d 45, 47] [motion made three hours before trial].)

---

[4] At its 1965 session the Legislature repealed Code of Civil Procedure sections 1980.1-1980.7, effective January 1, 1967, but reenacted their provisions in the virtually identical language of sections 890-897 of the new Evidence Code. (Stats. 1965, ch. 299.) For convenience, the various sections of the Uniform Act will be referred to throughout this opinion as they appeared in the Code of Civil Procedure at the time the case was tried.

Moreover, a careful study of the record reveals that the trial court did *not* exclude the results of the blood tests of Ganzer and Wright for the reason that they were "other men" not charged with paternity in the complaint. Instead, the court reversed its first rulings on blood tests, reopened the case, appointed its own expert, and ordered such tests to be made using both the "standard" systems of blood grouping (ABO, MN, Rh) and the more recent systems still in varying stages of experimentation and development (e.g., Kell-Cellano, S, Lu, Duffy, Kidd, Lewis, etc.). The expert, Dr. Jennings, found that Ganzer was excluded from paternity on the basis of the Rh system, the MN system, and the Kell-Cellano system, and that Wright was excluded on the basis of the Kell-Cellano system alone. A report to this effect was presented to the court, and counsel for plaintiffs vigorously urged its admission into evidence. After patient consideration of much testimony, argument, and documentary material relating to the reliability or lack thereof of the Kell-Cellano system, the court excluded the doctor's report and testimony on the ground that there was an insufficient foundation of medical acceptance.

▮▮▮ Plaintiffs contend that it was prejudicial error to exclude this evidence, arguing that the medical experts "disagreed in their conclusions" and hence the question should have been submitted to the jury pursuant to Code of Civil Procedure section 1980.6. That section, however, deals with a disagreement in the experts' conclusions "based upon the tests," and thus presupposes agreement on which are the appropriate tests to administer. Similarly, section 1980.3 authorizes the court to order the parties "to submit to blood tests"; but it nowhere specifies which tests may be thus ordered, and impliedly leaves the matter to be decided according to general rules of evidence. ▮▮▮ The rule which the trial court correctly followed was well stated in the leading federal case of *Frye* v. *United States* (D.C.Cir. 1923) 293 F. 1013, 1014 [54 App.D.C. 46] : "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made *must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*"

(Italics added.) This is also the rule in California. (See, e.g., *People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577] ["truth serum"]; *People* v. *Carter* (1957) 48 Cal.2d 737, 752 [312 P.2d 665] ["lie detector" test]; cf. *People* v. *Williams* (1958) 164 Cal.App.2d Supp. 858, 860-862 [331 P.2d 251] ["Nalline" test].)

In applying this rule the trial court considered, in the absence of the jury, the testimony of Drs. Jennings and Sturgeon, as well as numerous articles from medical literature on the subject. Plaintiffs stress those aspects of Dr. Jennings' testimony which support their position, but a somewhat different picture emerged under further questioning of the witness. While Dr. Jennings personally believed that Kell-Cellano tests could exclude paternity with reasonable medical certainty if properly performed and adequately controlled, he conceded that "in the matter of paternity testing, I must say that the Kell system is not ordinarily used. There is no question about it. And I think when we look at the recommendations as they have come from the Committee on Legal Medicine of the AMA, they recommend that for routine application of blood groups for disputed parentage problems that the tests shall be in the ABO system, the MN system and the Rh systems."

The lack of widespread acceptance and use of the Kell-Cellano tests was further brought out during defendant's *voir dire* examination of Dr. Jennings:

"Q. By MR. CROWLEY: The point is this, Doctor, you have performed, have you not, many thousands of what we call the standard tests, the ABO, MN and Rh-Hr tests? A. Yes, that's true.

"Q. And as a result of these many thousands of tests that you have performed and also other doctors in the field throughout the United States, there has come to be a reliability or acceptance on these factors, isn't that true? A. Yes.

"Q. Now, there have been far, far less tests performed under the so-called Kell and Cellano tests, isn't that true? A. That is true.

"Q. How many, for example, Cellano tests have you performed? A. A few hundred, I suppose.

"Q. And it would also make a difference as to these tests as to whether or not as far as the reliability of the results were concerned, as far as predicting percentages and reactions as to whether or not these were taken say, throughout the United States, as distinguished from one small area? A. That's true.

"Q. In other words, there is a difference, for example,

because of the ethnic backgrounds of people, isn't that right? A. Very great.

"Q. And as far as you are concerned, Doctor, as far as your study of the medical literature on the field is concerned, particularly medical legal association and the American Medical Association, it has been recommended that the Kell-Cellano tests not be used as far as exclusion of paternity cases is concerned, isn't that true? A. That is true for the routine case. I believe that's true.

"Q. And one reason is, is it not, that these tests have not as yet had such widespread acceptance and there hasn't been enough widespread experience throughout the country so that we can definitely say that the results are going to be a given way, isn't that basically true? A. I'd say as routinely applied as they might be done in the ordinary laboratory across country, this is certainly true.

"Q. Because you don't know, do you, Doctor, for example, because of not having performed, say, enough tests throughout the country as to whether or not there might be exceptions as far as the heredity is concerned, as far as Cellano tests are concerned, for example, isn't that a fair statement? A. Well, it is still possible that new variants will be found, I'd say that."

Defendant's expert, Dr. Sturgeon,[5] testified that "although the Cellano factor was discovered not too long after discovery of the Kell factor, the availability of the serum to do the Cellano test has been extremely limited. . . . Well, this means, of course, that the reservoir of experience with this test is as limited as the availability of the serum with which to do the test." The witness further testified that although there is "an occasional individual" (e.g., Dr. Jennings) who is confident in the reliability of these tests, "I would not like to use them . . . for disputed paternity testing." Dr. Sturgeon did not know of "any record in medical literature where the Cellano test has been used in disputed paternity testing," and referred again to the American Medical Association's recommendation that the Kell-Cellano system not be used for this purpose. The witness frankly admitted, as plaintiffs emphasize, that he did not "feel qualified to say" whether the early deficiencies in the Kell-Cellano system had now been removed; but he did reiterate that he had "much greater doubts" as to

---

[5]In their trial brief on the subject of admissibility of blood tests, plaintiffs conceded that Dr. Sturgeon is, with Drs. Jennings and Sacks, one of the "most outstanding experts" on the use of the Kell-Cellano system.

the reliability of the Kell-Cellano tests than the standard tests.

The trial court also studied a broad spectrum of medical literature on the subject, which was virtually unanimous in supporting Dr. Sturgeon's conclusions. For example, in the report referred to by both Drs. Jennings and Sturgeon, the Committee on Medicolegal Problems of the American Medical Association stated in 1957 that in Kell tests "the agglutinates are somewhat more fragile than in Rh-Hr reactions, so that the reactions are not always readily reproducible. This difficulty in technique has apparently discouraged extensive investigation of this system. Furthermore, the use of the rare anti-K serum adds little information, since only one out of approximately 500 bloods fails to clump in such antiserums. For these reasons, as well as the small number of family studies carried out to date, this committee recommends that the K-k tests should not be used in routine medicolegal practice but be reserved for special cases only." Subsequent medical writers consulted by the trial court concurred in this recommendation.

In view of the foregoing array of medical testimony and literature, the trial court could justifiably conclude that, at least as of the time the court was called upon to rule (i.e., in May 1963), the Kell-Cellano system of blood grouping had not been "sufficiently established to have gained general acceptance in the particular field" of disputed paternity testing (*Frye* v. *United States* (D.C. Cir. 1923) *supra*, 293 F. 1013, 1014). Accordingly, no abuse of the court's discretion is shown in its refusal to admit the challenged testimony. It may well be, of course, that some day in the near or distant future the Kell-Cellano tests will achieve the same degree of acceptance as the present standard blood tests. In that event the courts will welcome their use as an aid in our never-ending pursuit of truth. But until that day comes we must continue to allow our trial judges to exercise their sound discretion in protecting both litigants and jurors against the misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.[6]

---

[6]Plaintiffs belatedly complain that the court erred in denying their offer of proof that Ganzer was excluded from paternity by two of the standard tests (Rh and MN) as well as by the disputed Kell-Cellano tests. But no such offer was made. After the court's ruling excluding the proposed testimony based on the Kell-Cellano tests, counsel for plaintiffs were allowed to make an offer of proof. Counsel thereupon made a single offer which included both Wright and Ganzer, and failed to specify which blood tests were to be relied upon to establish non-paternity. An objection to the offer was sustained on the specific ground that "The Court feels that there has not been a proper foundation to

■ The judgment must be reversed, nevertheless, because the court gave a prejudicially erroneous instruction on a matter vital to the jury's determination of the case. Ordinarily the mother's prior chastity or lack thereof is not an issue in a paternity suit, and it is error to ask questions for the sole purpose of discrediting her by casting inferences of general or specific immorality. (*Estate of Gird* (1910) 157 Cal. 534, 547 [108 P. 499, 137 Am.St.Rep. 131]; *Peterson* v. *Peterson* (1953) 121 Cal.App.2d 1, 6 [262 P.2d 613], and cases cited.) Where the evidence relates primarily to the issue of the paternity of the child, however, it is admissible even though it may be incidentally degrading to the mother. Thus, as noted above, the defendant is allowed to introduce evidence that the mother had sexual intercourse with another man or other men during the probable period of conception. As sexual intercourse is seldom conducted in the presence of witnesses, however, that evidence is usually circumstantial. One such circumstance, of course, is the simple physical opportunity of the parties to have intercourse. That condition is a necessary one, but it is not sufficient in and of itself. The law also recognizes that animal instinct does not prevail in modern society, and that acts of sexual intercourse do not occur spontaneously when a man and a woman are merely brought into each other's presence; there must ordinarily be an element of disposition or desire on the part of each to have sexual relations with the other. The latter element, however, was omitted from the relevant instruction (No. 29) given to the jury in the case at bar.[7]

This omission rendered the instruction fatally defective. In *Mensing* v. *Croter* (1930) *supra*, 209 Cal. 318, 320, the defendant established that the plaintiff and one Raiche were together

---

qualify the Doctor to testify on the Kell-Cellano and the minor tests." Plaintiffs took no steps to limit their offer to admissible evidence, and immediately rested their case. An offer of proof, however, must be specific; and where a general offer is made which includes some inadmissible matter, the entire offer may be rejected. (*Lewis* v. *Western Truck Line* (1941) 44 Cal.App.2d 455, 465 [112 P.2d 747].)

[7] "29. You are instructed that in determining whether or not it has been proven that the defendant is the father of the child, you shall take into consideration whether or not TERRY HUNTINGDON had sexual intercourse with any man or men other than the defendant at or about the probable time when, according to the usual laws of nature, the child was conceived.

"You shall also take into consideration whether or not TERRY HUNTINGDON had an *association* with some man or men other than the defendant, and an *opportunity* to have sexual intercourse with such other man or men, at or about the probable time when, according to the laws of nature, the child was conceived." (Italics added.)

on occasions during the probable period of conception (September 1923) and sought to introduce evidence that some 18 months earlier the two had lived in an illicit relationship. In upholding a refusal to admit the latter evidence, this court said: "It was, therefore, incumbent upon the defendant in this action to sufficiently show that during the period in the month of September, 1923, when the plaintiff and Raiche were at the same time in the city of Los Angeles, there existed *both the desire and opportunity* on the part of each for the resumption of their past illicit relationship." (Italics added.)

Defendant argues that the just quoted language from *Mensing* is mere dictum because the court went on to hold that there was no evidence that an opportunity for sexual intercourse between the plaintiff and Raiche occurred during the period of probable conception. This is true, but the court also specifically discussed the element of desire to have intercourse: "Raiche was not called as a witness in the case, and from the testimony of the plaintiff, under a most rigid cross-examination, it appeared that she had so far transferred her affections and desires toward the defendant herein as to have no wish to renew a past illicit connection with Raiche." (*Id.* at p. 321 of 209 Cal.)

Citing *Mensing,* the court in *Dastagir* v. *Dastagir* (1952) 109 Cal.App.2d 809, 813 [241 P.2d 656], stated that illicit relations between the mother of the child and a man other than the defendant "are neither proved, nor permitted to be inferred, unless evidence is introduced . . . which shows (1) a disposition to have such relations on the part of the party charged and (2) an opportunity to gratify it." (Accord, *Berry* v. *Chaplin* (1946) *supra,* 74 Cal.App.2d 652, 662-663.)

The same rule obtains in our sister states. Thus in *People* v. *Kirk* (1921) 223 Ill.App. 362, 364, the defendant in a bastardy case was excluded from inquiring whether the prosecutrix had been out at night during the possible period of conception in the sole company of certain men other than the defendant. In affirming, the appellate court held as an alternate ground that "as we understand the rule of evidence, two things must concur before such proof is admissible: First, the opportunity, and second, the disposition to have sexual intercourse together. The proof offered might have shown the opportunity, but there was no proof of the lascivious propensity of any of the men she is said to have been out with after dark; neither is there any proof that the prosecuting witness had any disposition to have promiscuous illicit relation with other men or any other

man than the defendant. Under all the circumstances it was not error to exclude the offered testimony.'' (Accord, *State* v. *Patton* (1936) 102 Mont. 51 [55 P.2d 1290, 1293, 104 A.L.R. 76]; *State* v. *Stephon* (1929) 179 Minn. 80 [228 N.W. 335, 336]; *Guy* v. *State* (1924) 20 Ala.App. 374 [102 So. 243, 244]; *State* ex rel. *Nussear* v. *Breeden* (1908) 41 Ind.App. 370 [83 N.E. 1020, 1021].)

Defendant relies on such cases as *Odewald* v. *Woodsum* (1886) 142 Mass. 512 [8 N.E. 347, 348], and *Walker* v. *State* (1905) 165 Ind. 94 [74 N.E. 614, 615]. But those decisions, as well as others defendant could have cited,[8] do not stand for the proposition that mere opportunity for sexual intercourse is enough; as stated in *Walker,* ''unlawful sexual commerce will not be presumed merely from proof of an opportunity for such indulgence.'' Rather there was in each case, as emphasized in *Odewald,* an association between the mother and a man other than the defendant ''under circumstances which naturally excite suspicion of improper relations between them.''

The differences between the foregoing two lines of authority are not as fundamental as defendant implies. Their point in common was touched on in *State* v. *Stephon* (1929) *supra,* 179 Minn. 80, 228 N.W. 335, 336, in which the court said that ''The opportunity must be more than a mere chance, and there must be both adulterous inclination and the opportunity to satisfy it. The opportunity and inclination must concur, and the inclination must be shown to exist at the time. Proof of inclination must extend to some conduct suggesting intent. It is usually necessary to show suspicious actions or incriminating circumstances.'' In other words, the defendant must be allowed to prove the sexual predisposition of the mother and a third party by means of circumstantial evidence; and proof they were together ''under suspicious circumstances'' is relevant to this purpose, particularly when they either created or took apparent advantage of such circumstances.

Viewed in this light, the question is analogous to that presented in divorce cases in which the plaintiff spouse seeks to establish by circumstantial evidence that the defendant spouse committed adultery with a third party.[9] In that situation the

---

[8]E.g., *State* v. *Kvenmoen* (1930) 60 N.D. 60 [232 N.W. 475, 477]; *De Mund* v. *State* (1918) 167 Wis. 40 [166 N.W. 328, 329]; *State* ex rel. *Bjorn* v. *Creager* (1916) 97 Kan. 334 [155 P. 29, 32].

[9]The analogy has been expressly drawn in such cases as *State* v. *Stephon* (1929) *supra,* 179 Minn. 80, 228 N.W. 335, 336, and *Twining* v. *State* (1964) 234 Md. 97 [198 A.2d 291, 298] [concurring and dissenting opinion of Marbury, J.].

proof must show both an opportunity for illicit intercourse and a disposition or inclination of the parties to engage in it. (*Schaub* v. *Schaub* (1945) 71 Cal.App.2d 467, 479-480 [162 P.2d 966]; *Wilson* v. *Wilson* (1932) 124 Cal.App. 655, 659 [13 P.2d 376]; *Koenigstein* v. *Koenigstein* (1921) 53 Cal.App. 673, 675 [200 P. 730]; *Bennett* v. *Bennett* (1920) 48 Cal.App. 670, 673 [192 P. 180]; see generally Keezer, Marriage and Divorce (Morland ed. 1946) pp. 382-386; 1 Nelson, Divorce and Annulment (2d ed. 1945) pp. 187-189, 192-198.) As the cases collected in the cited treatises demonstrate, however, there are numerous ways in which the required element of disposition or desire may be circumstantially proved.

Defendant urges that in the present case there was ample evidence of such disposition on Terry's part, and hence that the omission in the instruction cannot have been prejudicial. Defendant also claims that the instruction did not actually direct the jurors to return a verdict for him if they found that Terry had an association and opportunity to have sexual intercourse with other men during the probable period of conception, but merely advised the jurors what evidence they should "take into consideration" in determining that issue. Both of these arguments, however, are demonstrably refuted by an incident occurring in the course of the jury deliberations. The jury first returned to court and requested a rereading of the instructions "as to evidence and what is rebuttable." The court reread all the instructions, including No. 29. After further deliberations the jury presented the following note to the court: "Your Honor. Our interpretation of a part of your instruction to the jury is: — 'If association and opportunity for intercourse was available to another male at or about the same time as the probable period of conception, *we (the Jury) cannot find for the plaintiff*.' If this is a correct interpretation, *regardless of the conclusions reached after hearing and weighing all the other testimony*, do we have any other choice but to find for the defendant? HWT Foreman." (Italics added.) The court gave no direct answer to the query, but again read Instruction No. 29 and three related instructions. The jury thereafter returned a 9-3 verdict for defendant.

The language of the note demonstrates that the jury understood Instruction No. 29 to be mandatory rather than advisory; it also strongly implies that "after hearing and weighing all the other testimony" the jury would have returned a verdict for plaintiffs if they had had "any other choice." We

are of the opinion, after a review of the entire cause, including the evidence, that it is reasonably probable a result more favorable to plaintiffs would have been reached in the absence of this error. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Accordingly, the judgment must be reversed.[10]

It is contended that the trial judge erred in denying a post-trial motion to disqualify himself on grounds of prejudice from hearing the motion for new trial. The motion to disqualify, however, was simply a reiteration of plaintiffs' position on various evidentiary rulings made during trial, and the judge's counteraffidavit adequately disposes of the matter.

The law is clear that a state of mind of a judge based upon his observation of the witnesses and the evidence during the trial of an action does not amount to that prejudice against a litigant which disqualifies the judge from continuing to preside over the proceedings. (*Kreling* v. *Superior Court* (1944) 25 Cal.2d 305, 312 [153 P.2d 734].)

The order relating to the taxing of costs falls with the reversal of the judgment, and will abide the event. (*Kotronakis* v. *City & County of San Francisco* (1961) 192 Cal.App. 2d 624, 625-626 [13 Cal.Rptr. 709].)

Several other assignments of error are made, relating principally to the admissibility of evidence and the conduct of counsel; as the points raised are not likely to present any substantial difficulty upon retrial, we need not discuss them at this time.[11]

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.

---

[10]Plaintiffs did not waive the right to complain of this error on appeal by stipulating that the instructions, including No. 29, could be reread to the jury. There is some doubt that plaintiffs had adequate opportunity to study the proposed instructions in advance and confer with the court in chambers; and in any event, plaintiffs objected to the final reading to the jury of Instruction No. 29 on the specific ground that no mention was made therein of the element of desire or disposition to have intercourse, and that the instruction "will give the impression that [the jury] will have to bring in a verdict for the defendant."

[11]We pause only to take note of the trial court's severe reprimand of counsel for plaintiffs at the close of trial; the reproval appears to have been amply justified, and counsel would do well to bear it in mind in any further proceedings in this matter.