## Appellate Department, Superior Court, Los Angeles

[Crim. A. No. 16028. Feb. 16, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
VINCENZO PORPORA, Defendant and Appellant.

**COUNSEL**

Margolis, McTernan, Scope, Sacks & Epstein and Howard D. Sacks for Defendant and Appellant.

Burt Pines, City Attorney, and Ward G. McConnell, Assistant City Attorney, for Plaintiff and Respondent.

**OPINION**

**IBANEZ, J.**—Appellant appeals from a judgment of conviction after a court trial. The appellant was found guilty of violating section 8388.1 of the Fish and Game Code (commercial fisherman making a catch having more than 40 percent Pacific mackerel).

### STATEMENT OF FACTS

In the early afternoon of June 27, 1977, the commercial fishing vessel, *Southern Monarch,* with its captain, Vincenzo Popora, appellant, docked at the Star-Kist facility on Terminal Island. The vessel was loaded with a catch of fish weighing 71½ tons.[1]

[1]Hereinafter this cargo will be referred to as the fish catch.

 

The practice of commercial fishermen at this facility was to bring in their catch where it was weighed, processed and canned. As the fish left the vessel and were brought into the facility it was the duty of officials from the Department of Fish and Game (Department), to inspect the load in order to determine whether or not it exceeded the tolerance limits[2] of Pacific mackerel. On hand to inspect the fish catch were Michael Wade, a game warden and Margaret Baker (Baker), an employee of the Department.

The unloading of the fish was conducted in the following manner: The fish were pumped from the holds of the vessel through a coupling unit which moved the fish onto a conveyor belt. The conveyer belt, in turn, carried the fish to bins inside the cannery. Each bin had a capacity of 500 pounds. The conveyer belt was moved as each bin reached its capacity.

As the fish moved along the conveyer belt on the way to the bin, samples were taken. On duty and taking the samples from the fish catch was Baker, who scooped off fish into a bucket. The bucket was on a weighing scale. When the scale indicated that there were 30 pounds of fish, Baker stopped the scooping, that being the prescribed weight for each sample. The next step taken by Baker was to separate the 30-pound sample into species of fish. Each species was separately weighed and the weight of each species separately recorded. Fourteen samples each

---

[2]On June 27, 1977, the date here involved, the pertinent section of the Fish and Game Code limiting the fish catch of Pacific mackerel, read as follows: "Notwithstanding the provisions of Section 8388, following the effective date of this section, loads or lots of fish may contain 40 percent or less by weight of Pacific mackerel taken incidentally to other fishing operations, and any load of fish of less than three tons of weight may contain any amount of Pacific mackerel. The amount of Pacific mackerel in any load or lot of fish taken incidentally to other fishing operations in excess of 18 percent by weight of the load or lot and the amount of Pacific mackerel taken in any load of less than three tons shall be computed as part of any harvest quota permitted pursuant to Section 8388.5. The director may suspend the operation of this section whenever the season quota permitted pursuant to Section 8388.5 has been reached, and thereafter loads or lots of fish may only contain 18 percent or less by weight of Pacific mackerel. The director may authorize the taking of Pacific mackerel in accordance with the provisions of this section whenever the report submitted pursuant to Section 8388.3 determines that a harvest quota may be established and the director determines that Pacific mackerel and jack mackerel are schooling together in such a manner that the proper harvest of jack mackerel requires an increased tolerance for Pacific mackerel prior to October 1. No permits shall be issued by the department pursuant to Section 8388.5 whenever Pacific mackerel may be taken in accordance with the provisions of this section." (Fish & G. Code, § 8388.1.)

The pertinent provision of section 8388 of the Fish and Game Code, in effect on the date in question read as follows: ". . . Pacific mackerel may not be taken or possessed at any time for any purpose except loads or lots of fish may contain 18 percent or less by weight of Pacific mackerel taken incidentally to other fishing operations. Such Pacific mackerel, incidentally taken, may be used for any purpose."

weighing thirty pounds were taken, each species in each sample was separately weighed and separately recorded. The samples were taken at fixed intervals as follows: When approximately five tons of fish passed Baker along the conveyer belt, she scooped up a sample. Each of the 14 samples was taken at the stated intervals so that approximately 5 tons of fish separated each sample taken. Baker recorded her findings in a form entitled "Pacific Mackerel Survey-Sampling Data."

After each sample was weighed and recorded, as described, the fish in the sample moved on to join the other fish in the catch. The procedure described which included the unloading of the catch, taking the samples, separating the species, weighing and recording the findings, took approximately one hour.

The findings recorded by Baker indicated that 52.6 percent of the fish in the samples were Pacific mackerel. Applying this percentage to the 71½ ton fish catch the tolerance limit of Pacific mackerel was exceeded by 18,018 pounds.

Other facts will be stated later in connection with the issues to which they relate. We turn now to a discussion of the issues:

DISCUSSION

I

DID THE COURT ERR IN ADMITTING EVIDENCE OF THE SAMPLING PROCEDURE AND THE RESULTS THEREFROM?

██ Appellant argues that the results of the sampling test were erroneously admitted into evidence for the reason that the technique employed in obtaining the samples for the intended purpose did not measure up to the legal requirements of admissibility. Conversely, appellant argues, assuming that the results of the sample tests were properly admitted, the determination of the ultimate issue involved by the sampling method was lacking in the evidentiary support required for a judgment of conviction. (*People* v. *Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 433 P.2d 777].)

Before evidence of the sampling procedure and the results thereof was received, the foundation evidence, recited below, was received and considered by the court. (Evid. Code, § 402).

The sampling technique used in the instant case evolved from the work of members of the Department headed by Lieutenant Reed Smith. The end result was the technique followed by Baker, as described. This technique was used by the wardens themselves before delegating the work to aides like Baker.

The scale used by Baker to weigh the samples was approved by the bureau of weights and measures expressly for weighing samples.

Baker received special training in this sampling technique and was given written instructions. Warden Wade was one of the wardens from the Department who trained Baker; he testified that in his opinion she was performing the sampling technique skillfully and properly.

Baker was a major in biology in college. She testified that she could distinguish Jack mackerel from Pacific mackerel by their characteristics which she pointed out from photographs shown to her. The majority of the fish which she scooped up from the conveyer belt for samples was whole, Baker said, but she added that she could identify the species from parts of the fish less than the whole.

Klingbeil, a marine biologist with the Department, observed Baker sampling the fish catch. He said that from mere observation, as the fish moved along the conveyer belt, he could tell that the fish catch exceeded 40 percent Pacific mackerel. On seeing the samples taken by Baker, Klingbeil concluded that "it was a fairly rich load" [of Pacific mackerel].

Witeck, a statistical methods analyst for the Department testified. His educational background included a bachelor's degree in mathematics and chemistry and a graduate study in applied mathematics and statistics. His experience included six years of work in his field; he participated in the development of the Pacific mackerel sampling program. Witeck analyzed the Baker data saying that the figure of 52.6 percent Pacific mackerel was an estimate since it was based on a sample. Analyzing the Baker data at a 95 percent "confidence level" (for which the program was designed), he said, indicated the Porpora fish catch contained 47.9 to 57.3 percent Pacific mackerel and that "the probability that defendant's load contained 40 percent or less Pacific Mackerel was less than one chance in one thousand."

Witeck also testified that he had just completed a calibration analysis where the sampling technique was compared with an actual separation

and count of an entire load of 6,865 pounds. The sample indicated 85.8 percent; the load on the other hand contained 87.6 percent. He also testified that during the months of June, July and August only 14.6 percent of the loads of fish landed contained more than 40 percent Pacific mackerel.

The appellant contends that the foundational evidence to establish the reliability of the sampling technique was insufficient or lacked probative value, hence it was error to admit into evidence the conclusions made therefrom.

█ The rule that samples may be received into evidence to show the quality and condition of the entire lot or mass from which they were taken is well established.[3]

█ There are certain limitations to the rule allowing the admission of samples to prove condition, quality or nature of an article, substance or mass.[4]

---

[3]"Where a sample is taken, tested and subsequently introduced into evidence, the requirement is that the mass should be substantially uniform with reference to the quality in question and that the sample portion should be of such a nature as to be fairly representative. Otoe Co. Bank v. Delany, 88 F.2d 238 (8th Cir. 1937); Wigmore; Vol. II, 3rd Ed., p. 421, § 439 (1940).

"In a later case, E. K. Hardison Seed Co. v. Jones, 149 F.2d 252 (6th Cir. 1945), the Court of Appeals also permitted the introduction of samples to show quality or condition of an entire lot of seed. The court stated: 'Human experience has taught us that one thing concurrently may be associated with another. In other words, the presence of smoke indicates the presence concurrently of fire. Thus it is that samples are receivable in evidence to show the quality or condition of the entire lot or mass from which they were taken. The prerequisites necessary to the admission in evidence of samples are that the mass should be substantially uniform with reference to the quality in question and that the sample portion should be of such nature as to be fairly representative.' (At p. 256.)"

(*Rite Fabrics, Inc.* v. *Stafford-Higgins Co., Inc.* (S.D.N.Y. 1973) 366 F.Supp. 1; *Gormley* v. *U. S.* (4th Cir. 1948) 167 F.2d 454, 458; *Pennsylvania R. Co.* v. *Fox & London* (2d Cir. 1938) 93 F.2d 669, 671; Annot. Admissibility in Evidence of Sample or Samples of Article or Substance of Which the Quality, Condition or the Like Is Involved in Litigation. 95 A.L.R.2d 681-712; Sprowls *The Admissibility of Sample Data Into a Court of Law: A Case History* (1957) 4 UCLA L.Rev. 222.)

[4]"[T]he admissibility of samples to prove the condition, quality, or nature of an article, substance, or mass which is not before the court is subject to certain limitations and qualifications. Not only must the samples be properly identified as to source, and shown to be in the same or substantially the same condition as they were at the time such condition became material to the issues involved, but they must also, where offered to show the condition of a large amount of material, appear fairly representative of the whole. A further qualification having to do with the representative nature of a sample may be found in certain cases which refer to the requirement that the circumstances and uses of the sample, at the time of its taking, must be shown to be similar to the circumstances and uses of the object or mass whose condition, nature, or quality it purports to establish." (Fns. omitted.) (29 Am.Jur.2d, § 773, p. 842.)

The appellant argues that evidence of the sampling technique and the conclusions drawn therefrom were inadmissible for the reason that this technique has not gained "general acceptance in the particular field to which it belongs," citing *Huntingdon* v. *Crowley* (1966) 64 Cal.2d 647 [51 Cal.Rptr. 254, 414 P.2d 382] and *Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013, 1014. The issue involved in these two cases was the admissibility of a "scientific principle or discovery."[5] No such issue is before us. Sampling is not a novel technique. It is not a scientific analysis of an experimental nature. In essence, sampling is an assay. In the instant case a determination of the kinds of species of fish in each sample was made by observation. Baker was trained to distinguish the characteristics of each species. The samples were taken at regular and prescribed intervals to assure common characteristics between the samples on the one hand and the mass on the other. (See *Fox* v. *Hale & Norcross Silver Mining Co.* (1895) 108 Cal. 369, 402-409 [41 P. 308]; *Rodwin Metals, Inc.* v. *Western Non-Ferrous Metals, Inc.* (1970) 10 Cal.App.3d 219, 224 [88 Cal.Rptr. 778].)

The technique employed in obtaining the samples, the intervals at which the samples were taken and their number, rationally demonstrated the common characteristics between the samples on the one hand and the mass on the other, which in turn, lead to the reasonable inference that the fish catch exceeded the permissible percentage of Pacific mackerel.

Qualified experts for the People demonstrated the statistical reliability of the inference made from the samples; they confirmed as well the validity of the sampling technique employed.[6] No significant evidence was presented by the appellant that would support the contention he now makes on appeal, namely that the sampling technique was so unreliable for its intended use that the conclusions or opinions based thereon should not have been admitted into evidence. The admissibility of the evidence

[5]"The rule which the trial court correctly followed was well stated in the leading federal case of *Frye* v. *United States* (D.C.Cir. 1923) 293 F. 1013, 1014 [54 App.D.C. 46]: 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made *must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*' " (*Huntingdon* v. *Crowley, supra,* 64 Cal.2d 647, 653.)

[6]"There is a probability factor in even the most carefully structured scientific inquiry; seldom is it possible to exclude all possible chance for error in human endeavor. But there is no requirement in our law that the admissibility of scientific-test evidence must be predicated on a 100 percent degree of accuracy." (*People* v. *Slone* (1978) 76 Cal.App.3d 611, 625.)

was uniquely within the province of the trial court. We conclude that the court did not abuse its discretion in allowing this evidence to be received.

"The genius of the more thoughtful and judicious decisions of the modern day is to admit into evidence any rational proof that may have a tendency to illuminate the transaction on trial or materially aid in determining the issue but subject, of course, to the discretion of the trial court in excluding extraneous matter. (See Evidence, 18 Cal.Jur.2d, § 116, p. 555.)" (*Odell* v. *Frueh* (1956) 146 Cal.App.2d 504, 511-512 [304 P.2d 45].)

We turn to consider defendant's second contention:

## II

### WAS THE APPELLANT DEPRIVED OF THE OPPORTUNITY TO CHALLENGE THE SAMPLING TECHNIQUE AND THE CONCLUSIONS THEREFROM SO AS TO DEPRIVE HIM OF A FAIR TRIAL?

■ Appellant contends that the failure of the People to preserve the fish, or make them available, denied him access to evidence which would have enabled him to impeach the reliability of the sampling technique and the conclusions made therefrom. Had the fish been made available to him, defendant asserts, "he could have retested using the same or different sampling technique," or "he could have photographed the load to record the appearance of the fish and the sample at the time and place of the testing," or, appellant says, he could have "sorted and weighed the entire lot." In support of this contention defendant relies on *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361].

Appellant was not deprived of an opportunity to make his own determinations or findings concerning the fish catch, as he asserts. He was a sea captain of a fishing vessel. We can properly assume that as such he was familiar with the laws relating to commercial fishing; we can reasonably assume also that he knew of the potential violations under the Fish and Game Code in a given fish catch. Forearmed, as he was, with this knowledge and experience and having the responsibility as sea captain of the vessel, there was not even a minimal response on his part to ascertain, for himself, the nature of the fish catch, especially where, as here, one witness, Klingbeil, a marine biologist, testified that from mere observation "it was a fairly rich load" [of Pacific mackerel]. Instead the

appellant remained at the terminal just long enough to get the "fish ticket," and then left.

Mr. Wade, the warden, testified that as soon as he learned that a violation was indicated he went to the place where the "fish tickets" are issued for the fish catches delivered. His purpose was to seize the ticket for the Porpora fish catch, which was the practice of the Department when a violation was indicated. The appellant had preceded the warden, obtained the "fish ticket" and departed. It is evident that, contrary to appellant's assertions, he was not deprived of an opportunity to test the findings and conclusions made by the Department as to the fish catch.

Turning to a comparison of *Hitch, supra,* 12 Cal.3d 641, and the instant case, there are at least two significant differences. The first is that in *Hitch,* two small ampoules were intentionally or inadvertently destroyed by the prosecution. There was no such "destruction" of the fish catch in the instant case. At some point in the unloading of the fish, the identity of the fish catch was destroyed either by commingling with other fish or by the canning. In either case this was in accordance with appellant's instructions to the cannery or it was within his expectations on delivering the fish catch to the cannery.

The second difference is the practical problem presented in preserving two small ampoules, on the one hand, as compared to preserving 71½ tons of deteriorating fish or, at best, 14 samples each weighing 30 pounds, on the other hand.

In *People* v. *Miller* (1975) 52 Cal.App.3d 666, 670 [125 Cal.Rptr. 341], the court stated that the rationale in *Hitch* does not require that "all the evidence which can be made demonstrative *must* be so transformed . . . ." Indeed, "[such] unwarranted extension of *Hitch* could have strange and unsettling results." (Italics in original.)

We note in passing that the record does not show when the commingling or canning of the Porpora fish catch occurred, whether it was before or after the results of the sample testings were made known; nor does the record show what steps, if any, appellant took to ascertain whether his catch exceeded the tolerance limits for Pacific mackerel.

# III

REGARDING THE CONTENTION THAT SECTIONS 12159-12161 OF THE
FISH AND GAME CODE IMPOSE CRUEL OR UNUSUAL PUNISHMENT
AND DENY DUE PROCESS OF LAW, AND THAT THE FORFEITURE
IMPOSED WAS IN EXCESS OF THE COURT'S JURISDICTION:

■ The court ordered the forfeiture of all the Pacific mackerel in the Porpora fish catch pursuant to the provisions of section 12161 of the Fish and Game Code [all section references hereinafter will be to this code]. This section requires that upon conviction, the fish comprising the illegal catch shall be forfeited. The seizure is authorized under section 12159 and the sale under section 12160.

Appellant argues that the punishment imposed upon him bears no reasonable relationship to the nature and severity of his offense; that it was impossible to know the actual mixture of fish before they were caught; and even when caught and brought aboard, it is impossible to accurately assess the percentage of one species in the total catch. His acts were therefore neither intentional nor culpable, appellant asserts. (*In re Rodriguez* (1975) 14 Cal.3d 639, 652-653 [122 Cal.Rptr. 552, 537 P.2d 384].) (*Jackson* v. *Indiana* (1972) 406 U.S. 715, 738 [32 L.Ed.2d 435, 450-451, 92 S.Ct. 1845].)

However, "even if the forfeiture imposed can pass Constitutional muster," appellant argues, "the quantity of fish forfeited was incorrectly determined." The statute authorizes a forfeiture of only the Pacific mackerel which is in excess of the tolerance limit—not of the entire catch of that species.

The appellant refers to the authorities which support the rule that forfeitures are looked upon with disfavor, saying that "Courts . . . will refrain from . . . [declaring a forfeiture] where there is evidence of good faith and a substantial effort of a party to perform its obligations . . ." (*No Oil, Inc.* v. *Occidental Petroleum Corp.* (1975) 50 Cal.App.3d 8, 30 [123 Cal.Rptr. 589]). He also refers to the principle relating to the strict interpretation of forfeiture statutes. (*People* v. *United Bonding Ins. Co.* (1971) 5 Cal.3d 898, 906 [98 Cal.Rptr. 57, 489 P.2d 1385].)

The assertion by the appellant that there is no practical or feasible way for fishermen to comply with the tolerance limit is not supported by the record. A large percentage of fishermen do so. Pacific mackerel can be

identified in the water before they are brought aboard. Also, they can be netted in large quantities and released without killing them. Moreover, appellant could have set a three-ton net first to determine what he might catch without violating the law. (§ 8388.1.) (Fn. 2, *ante.*)

Section 8388 provides that Pacific mackerel "may not be taken at any time for any purpose" except that a catch is permitted to contain 18 percent or less when "taken incidentally to other fishing operations." Section 8388.1 temporarily increased the allowable percentage to a maximum of 40 percent, but the condition that Pacific mackerel be taken only "incidentally to other fishing operations" remained. Where a catch exceeds the statutory limit, especially where, as here, the limit is 40 percent, a reasonable inference can be made that the Pacific mackerel was not caught "incidentally to other fishing operations." A more persuasive inference, properly made by the trial court, is that the appellant directed his fishing energies towards a maximum catch without regard to the limits imposed upon him by law.

We come to the conclusion that the seizure of the entire fish catch was authorized by the statute and no constitutional rights of the appellant were violated.

█ We also come to the conclusion that there is no merit to appellant's contention that the statute should be interpreted to mean that the forfeiture be limited to the fish catch of Pacific mackerel in excess of 40 percent. Such an interpretation of the statute would defeat the legislative intent to conserve sea life by encouraging negligent or intentional disregard for the law by commercial fishermen.

IV

ON THE ISSUE OF CLAIMED UNLAWFUL SEARCH AND SEIZURE:

█ The record indicates that the only evidence admitted over a Fourth Amendment objection was the "fish ticket." This document was not "seized." It was the Department's own copy issued to it by the cannery pursuant to sections 8011-8014 (1969). This contention of appellant is without merit. (*People* v. *Maxwell* (1969) 275 Cal.App.2d Supp. 1026 [80 Cal.Rptr. 86]; *People* v. *Di Bernardo* (1978) 79 Cal.App.3d Supp. 5 [144 Cal.Rptr. 902].) We also note that no timely objection to this evidence was made by appellant under Penal Code section 1538.5, subdivision (g).

V

## HAVE THE ACTS BEEN DECRIMINALIZED BY THE EXPIRATION DATE OF THE STATUTE OR BY ITS AMENDMENT?

After oral argument, and by leave of court, an additional issue was presented to us for determination: Were the acts of appellant committed on June 27, 1977, which constituted the violation decriminalized (a) because the section of the law violated expired by its own terms on January 1, 1978, or (b) because of an amendment to that section made effective on June 30, 1978? We conclude that neither the expiration date of the section of the law violated nor its subsequent amendment decriminalized the acts of appellant.

The statutory scheme of the law relating to the protection of Pacific mackerel makes clear its purpose and intent. Violence to that purpose and intent would be done by interpreting the law, based upon either one of the stated grounds, as decriminalizing the acts of appellant.

The violative acts of appellant were committed on June 27, 1977. On that date, before and at all times thereafter through June 29, 1978, the date of the amendment, the purpose and intent of the Legislature did not change. It was to enhance the resource of Pacific mackerel. (§ 8388.5, formerly § 8388.3.)

A recital of how the statute is put into effect makes clear that the changes in the section of the law in question by the expiration date and the amendment noted are integrated and coordinated parts of a mechanism in the statute to make viable its purpose, namely to enhance the resource of Pacific mackerel. On July 31 of every year the Department makes a determination of the "spawning population" of Pacific mackerel stated by a factor. The "season harvest quota" is determined by a stated percentage of the "spawning population" factor. The former increases or decreases in the stated percentage with the latter. (§§ 8388.3, 8388.5, now 8388.5.)

Opening of the fishing season occurs on October 1 of every year (§ 8388.7). Pacific mackerel, in any quantity, may be taken until the harvest reaches the quota; then it may be taken only incidental to other fishing but within a stated percentage.

Prior to June 7, 1977, (being prior to the catch by the appellant), the permissible limit of Pacific mackerel was 18 percent (§ 8388). Thereafter, and in effect on June 27, 1977, the date of appellant's act, the percentage was increased to 40 percent. This was done by the enactment of section 8388.1 which carried its own expiration date of January 1, 1978, stating that on this date it "shall have no further force and effect and is repealed" and section 8388.5 "shall read as it read immediately prior to the effective date of this act."

By the expiration of section 8388.1 the statutory system reverted to what it was prior to June 7, 1977, namely the limit was reduced from 40 percent back to 18 percent.

That the changes in the allowable fish catch are an integral part of a plan to carry out the purposes of the statute is also evident by the following fact: Even during the life span of the 40 percent limit under section 8388.1 the Department, at any time, was authorized to suspend the 40 percent limit and return to the 18 percent limit if it determined that the "harvest quota" had been met.

The amendment, effective June 30, 1978, like the expiration date noted, likewise confirms the pervasive nature of the statutory scheme and its purpose, namely, to enhance the resource of Pacific mackerel in order to increase and sustain the "season harvest quota" by varying the limits of permissible catch with the fluctuations in the "spawning population."

It would unduly lengthen this opinion without purpose to describe the changes brought about by the amendment. These changes, like those brought about by the operation of the expiration date, are but a continuation of the statute. "There is no break in the continuous operation of the old statute, and no abatement of any of the legal consequences of acts done under the old statute."[7]

"The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the

[7]"When a statute, although new in form, re-enacts an older statute without substantial change, even though it repeals the older statute, the new statute is but a continuation of the old. There is no break in the continuous operation of the old statute, and no abatement of any of the legal consequences of acts done under the old statute. . . .

"This rule of construction, based as it is on the presumed legislative intent, applies whether the subject of the statute is civil or criminal law. It is well-settled that, independently of a saving clause, a person may lawfully be prosecuted, under a repealed and re-enacted statute, for a crime committed prior to the date of the re-enactment." (Sobey v. Molony (1940) 40 Cal.App.2d 381, 385 [104 P.2d 868].)

purpose of the law." (*Select Base Materials, Inc.* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672], and cases there cited; *East Bay Garbage Co.* v. *Washington Township Sanitation Co.* (1959) 52 Cal.2d 708, 713 [344 P.2d 289].) ■ Statutes are to be construed so as to effect the intent of the Legislature. (Code Civ. Proc., § 1859; *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315].)

The appellant relies upon the rule stating that "when the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct that was formerly deemed criminal, this action requires dismissal of a pending criminal proceeding charging such conduct." (*Bell* v. *Maryland* (1964) 378 U.S. 226, 230 [12 L.Ed.2d 822, 826, 84 S.Ct. 1814]; *People* v. *Rossi* (1976) 18 Cal.3d 295, 304 [134 Cal.Rptr. 64, 555 P.2d 1313].) Appellant's reliance on these authorities is misplaced. ■ Neither the termination date nor the amendment abrogated the law's sanctions removing the "state's condemnation from conduct." The proscription remained as a constant throughout, namely the proscription against taking particular fish in quantities in derogation of enhancement of the resource. The only change was in the permissible quantity of the catch allowed which varied from season to season in order to fulfill the purpose of enhancing the resource.

The judgment is affirmed.

Cole, P. J., and Bigelow, J., concurred.