[Crim. No. 6814. In Bank. June 26, 1961.]

THE PEOPLE, Respondent, v. DAVID ALLAN COMBES, Appellant.

138

Ben K. Ashby, under appointment by the Supreme Court, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Bruce A. Thompson, District Attorney, for Respondent.

McCOMB, J.—Defendant was found guilty of first degree murder, and the jury fixed the penalty at death. His appeal is automatic, pursuant to section 1239, subdivision (b), of the Penal Code.

Viewing the evidence in the light most favorable to the People, the record discloses the following facts:

Between August 1 and August 15, 1960, defendant, a parolee, met with three other parolees, Parker, David and Perrin, in Oakland, California. During that period defendant said several times that he would be killed before he would be sent back to prison.

Before August 16, 1960, the four men planned to rob a market in Redwood City. Defendant obtained a gun for this job, so that he would not be taken by anyone who tried to stop him. He tested the gun on August 16, 1960, to make sure it would work. Although it would fire, it malfunctioned, and unsuccessful attempts were made to repair it. On August 17, 1960, defendant, Parker and David went to Redwood City and stole a car for the purpose of robbing the market. They did not carry out the robbery. At that time defendant stated he would "have to go all the way," because he was not going back to prison.

The three men then embarked on a series of robberies. On August 17, 1960, upon leaving Redwood City, they drove toward Bakersfield. During that drive defendant stated he would not be taken back alive. That evening they held up a drug store in Oildale. At that time defendant expressed dissatisfaction because his gun did not work very well, and he suggested they go to Las Vegas to buy better guns. They did so, defendant purchasing a Colt .32 automatic on August 18, 1960.

They started back to California the same day and stopped in the desert to target practice. Defendant said at that time, "I want to be able to use this [gun] good enough to hit a man." He also stated that rather than go back to prison he would "hold court" in the street. In convict jargon, to "hold court" means to fight it out, or to shoot it out with the authorities and kill as many as possible before the convict himself is killed.

After target practicing, the men drove on toward Los An-

geles. They stopped in San Bernardino, intending to rob a store, and there formulated a plan to shoot their way out in the event a policeman attempted to apprehend them. Defendant said he would not go back to ''the joint'' (San Quentin) for any reason.

Somewhere between San Bernardino and Ventura they robbed a gas station. They arrived in Ventura in the early morning of August 19 and checked in at a hotel. That afternoon they drove to Santa Barbara for the purpose of locating a place to rob. They decided upon a drug store and returned to Ventura in the early evening for their guns. They then returned to Santa Barbara, but the drug store was closed; so they looked around for another place to rob. They decided upon a liquor store.

David and Parker held up the assistant manager of the store while defendant waited in the car to drive. This robbery occurred shortly before 10 p.m. on August 19, 1960. They took between $150 and $200. The assistant manager of the liquor store alerted the police and gave descriptions of the men who had robbed him. At 10:16 p. m. the Ventura County Sheriff's radio operator received a call from Santa Barbara about the robbery, including descriptions of the suspects.

At 10:17 p.m. the radio operator dispatched Auxiliary Deputy Sheriff Bryce Patten to establish a roadblock on Casitas Pass Road in Ventura County. At 10:29 p.m. Patten radioed back that he had established the roadblock.

Defendant, Parker and David drove from Santa Barbara toward Ventura and turned off the main highway onto the Casitas Pass Road. Defendant was driving, while David was in the right front seat and Parker in the back seat. After proceeding 10 or 15 minutes they observed a patrol unit parked in the road with red lights flashing.

Defendant stopped the car. The deputy sheriff came to the window and asked for identification. Defendant and Parker handed him identification cards. David had none.

The deputy asked them to get out of the car. They did so, defendant getting out by the left front door with his gun in his hand. He fired two or three times at the deputy. The deputy fell. Defendant walked rapidly to where the deputy lay and fired several more times while the deputy tried to raise up on his elbow. Neither Parker nor David fired any shots. Defendant yelled, ''Get in the car,'' and they drove off at a high rate of speed.

As they drove away, Parker and David looked out the back

window and observed the deputy pull himself up on the fender of his patrol unit and then collapse by the left front door. Defendant said, "You didn't think I'd do it, did you," and "You should have seen the look on his face when I shot him." He also stated that he had hit the deputy in the chest "every time"; that he must have hit him in the lung to cause bubbles of blood to come to his mouth; and that he would like to have seen the body to observe where he shot the officer.

The men drove to their hotel in Ventura and packed. While in the hotel defendant explained what had happened at the scene. He stated that he saw the officer had stepped into his headlights and could not see, so he reached for his gun and fired at the officer, who fell down, and that he shot him again as he lay on his back. He said that he did not feel any different and if he had it to do all over again he would do the same thing.

Defendant and his companions then fled from California to Arizona, New Mexico and Texas, and in a few days returned to California.

They hid the .32 caliber murder gun under a rock in the desert.

They were arrested in Bakersfield about 2:30 a.m. on August 25, 1960, six days after the murder. By 9 a.m. the sheriff of Ventura County, with the undersheriff and four or five deputies, arrived in Bakersfield. The sheriff immediately thereafter detailed some of the members of his staff to collect evidence in Modesto, the Las Vegas-California border area, and other nearby points in connection with the charges against defendant and his companions, and it was not until the following afternoon that sufficient members of the staff were available to transport the three men back to Ventura. Defendant was arraigned in Ventura at 5 p.m. on that day.

During the time they were held in Bakersfield all three men made confessions.

An autopsy disclosed that the deputy sheriff had been struck by eight bullets. The fatal wound entered near the collarbone, coursing downward through the jugular vein, causing massive hemorrhaging. The other wounds ranged from the upper torso to the abdomen and thigh. Some of the wounds in the torso and thigh coursed upward and backward, indicating that they were inflicted while the deputy was in a horizontal position.

Defendant took the stand as a witness in his own behalf and stated that he had participated in the robbery at Santa Barbara and had driven to the roadblock. He admitted that he

shot the officer several times and hit him "three or four or five times." He said that he shot fast because he "didn't want the officer to use a shotgun." He also admitted on cross-examination that he bought the .32 Colt automatic in Las Vegas so that if anybody tried to stop him or got in his way, he would have a weapon and could shoot his way out.

Defendant does not question the sufficiency of the evidence to support the verdict and judgment of guilty of murder in the first degree, but makes the following contentions:

First: *That he was denied a "fundamental right" in that he was not brought before a magistrate as quickly as conceivably possible after his arrest.*

This contention is devoid of merit. ▇▇▇ A violation of a defendant's right to be taken before a magistrate within the time specified by the law does not require a reversal unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof. (*Stroble* v. *California,* 343 U.S. 181, 197 [72 S.Ct. 599, 96 L.Ed. 872]; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 9 [291 P.2d 929]; *Dragna* v. *White,* 45 Cal.2d 469, 473 [9] [289 P.2d 428]; *People* v. *Stroble,* 36 Cal.2d 615, 626 [7] [226 P.2d 330]; *People* v. *Jackson,* 183 Cal.App.2d 562, 573 [17] [6 Cal. Rptr. 884]; *People* v. *Guarino,* 132 Cal.App.2d 554, 558 [3] [282 P.2d 538].)

The record in the present case affords no basis for an inference that defendant was prejudiced by any delay in being taken before a magistrate or that he was deprived of a fair trial. Actually, as will hereinafter appear, there was no unnecessary delay.

Second: *That his detention was unlawful, in that he was arrested in Kern County and not promptly taken before a magistrate.*

This contention is not sound. On August 24, 1960, which was the day before defendant was taken into custody, a complaint was filed in the Ventura Municipal Court charging him with the crime of murder. Under section 859 of the Penal Code[1] he was therefore entitled to be taken before a magistrate without unnecessary delay.

---

[1]Section 859 of the Penal Code reads, in part: "When the defendant is charged with the commission of a public offense, over which the superior court has original jurisdiction, by a written complaint subscribed under oath and on file in a court within the county in which the public offense is triable, he shall, without unnecessary delay, be taken before a magistrate of the court in which such complaint is on file. . . ."

■ Section 821 of the Penal Code, relating to arrests in counties other than where the crime was committed, reads in part: ". . . If the defendant is arrested in another county, the officer must, upon being required by the defendant, take him before a magistrate in that county, who must admit him to bail in the amount specified in the [warrant]. . . .

"If the warrant on which the defendant is arrested in another county does not have bail set thereon, or if the defendant arrested in another county does not require the arresting officer to take him before a magistrate in that county for the purpose of being admitted to bail . . . the arresting officer shall immediately notify the law enforcement agency requesting the arrest in the county in which the warrant was issued that such defendant is in custody, and thereafter such law enforcement agency shall take custody of such defendant within five days in the county in which he was arrested and shall take such defendant before the magistrate who issued the warrant. . . ."

Section 821 was followed precisely in the present case. Defendant was arrested in another county. There was no bail set on his warrant. He did not request to be taken before a magistrate in Kern County, and the arresting officer immediately notified the sheriff of Ventura County, who took custody of defendant. Defendant was thereupon arraigned in less than two days before the magistrate who issued the warrant.

■■ Section 821 does not authorize a five-day delay in all cases, but, rather, places a limit upon what may be regarded as a necessary delay in a case where the defendant has been arrested in another county; and a detention of less than five days, if unreasonable under the circumstances, would be a violation of the statute. (*Dragna* v. *White, supra,* 45 Cal.2d 469, 473 [7] ; *People* v. *Stroble, supra,* 36 Cal.2d 615, 625.)

■ Under the circumstances of the present case, however, it cannot be said that the delay of less than two days was unreasonable. The undersheriff of Ventura County testified that at least two officers are required to transport a person charged with the crime of murder. This means that no less than six officers were needed to transport the three men back to Ventura. But since most of the Ventura officers who had come to Bakersfield were carrying out the sheriff's instructions to collect evidence regarding the case, not enough of them were available to take defendant and his two companions back to Ventura until the afternoon of August 26.

The action of the sheriff in detailing members of his staff to gather evidence regarding the crime was reasonable. Defendant and his companions had left their automobile in the Frazier Park area, and within an hour and a half after their arrival in Bakersfield, one or two officers were assigned to recover it. Others were sent to Modesto to pick up luggage the men had left there.

Early the next morning several of the officers flew to the Las Vegas desert area with one of the men to recover the murder weapon, which had been hidden there under a rock. Since it would have been almost impossible for the officers to locate the weapon alone, taking one of the men along to show them where it had been hidden and recovering it before returning the men to Ventura resulted in a great saving of time.

Under the circumstances, therefore, there is no basis for defendant's contention that there was an unnecessary delay in bringing him before a magistrate.

▆▆▆ Third: *That he was denied a "fundamental right" in that his motion for an immediate preliminary hearing was denied.*

This contention is untenable. Defendant was arraigned on Friday, August 26, 1960, about 5 p.m., and an attorney was appointed to represent him. The arraignment was before a magistrate in the Ventura Municipal Court, and the magistrate continued the matter until 1:30 p.m. on Monday, August 29, 1960. At that time defendant, with his attorney, appeared before the magistrate and made a motion for an immediate preliminary hearing under section 860 of the Penal Code. Other preliminary hearings were already scheduled on the court's calendar, and the district attorney represented that he was not prepared to proceed with an immediate preliminary hearing.

Although the magistrate was willing to set the matter at the earliest opportunity considering his calendar, the district attorney moved to dismiss the complaint in order to avoid all possibility of procedural error.

Whether defendant was entitled to an immediate preliminary hearing under the complaint, even though the court calendar did not permit it and the district attorney was not prepared to proceed, is immaterial, in view of the fact that the complaint was thereupon dismissed, and defendant was later tried and convicted under an indictment by the grand jury.

Each was a separate proceeding, and no error committed in connection with the complaint could affect the proceedings under the indictment. (*People* v. *MacCagnan,* 129 Cal.App.2d 100, 112 [20] [276 P.2d 679] [hearing denied by the Supreme Court] ; *People* v. *Grace,* 88 Cal.App. 222, 228 [263 P. 306] [hearing denied by the Supreme Court].)

 Fourth: *That he was denied a "fundamental right" in that after the complaint filed before the magistrate had been dismissed, a grand jury indictment charging the same offense as that charged in the complaint was later filed in the superior court.*

This contention is untenable. The dismissal of an indictment, information or complaint charging a felony is not a bar to another prosecution for the same offense. (Pen. Code, §§ 999, 1387[2]; *People* v. *Godlewski,* 22 Cal.2d 677, 681 [1], 683 [140 P.2d 381].)

It is unimportant that defendant was charged originally by a complaint filed in the municipal court and then, after dismissal of the complaint, by a subsequent indictment. (*People* v. *Vacca,* 132 Cal.App.2d 8, 9 [281 P.2d 315] ; *People* v. *MacCagnan, supra,* 129 Cal.App.2d 100, 112 [20] [hearing denied by the Supreme Court] ; *People* v. *Grace, supra.*)

*People* v. *Elliot,* 54 Cal.2d 498 [354 P.2d 225], relied on by defendant, is not applicable to the facts in the present case. The holding in that case was simply that where a defendant is proceeded against by way of complaint, the commitment procedure set forth in title III, chapter VII [§§ 858-883], of the Penal Code must be followed, and that if the magistrate disregards substantial rights guaranteed to the defendant at any stage of such proceedings, the resulting commitment is unlawful. Such is not the situation in the present case.

Fifth: *That he was deprived of the right to counsel because of the dismissal of the complaint against him.*

This contention is unsound. As an indigent, defendant was entitled to have counsel appointed for him at the time of arraignment before the magistrate. (Pen. Code, § 859.) This was done. Upon the dismissal of the complaint on August 29, 1960, the magistrate's appointment of counsel ceased.

---

[2]Section 999 of the Penal Code reads: "An order to set aside an indictment or information, as provided in this chapter, is no bar to a future prosecution for the same offense."

Section 1387 of the Penal Code reads: "An order for the dismissal of the action, made as provided in this chapter, is a bar to any other prosecution for the same offense if it is a misdemeanor, but not if it is a felony."

Thereafter there was no attorney formally appointed to represent defendant, and paid for by the government, until August 31, 1960, when he was arraigned on the indictment and the same attorney appointed to represent him.

A person against whom no criminal proceeding is pending is not entitled, as a matter of right, to have someone furnished him as an attorney. Mere termination of the appointment by the dismissal of the complaint against defendant did not, as a matter of fact or law, establish that defendant was deprived of any right, and it does not establish that he was without the actual services of an attorney in the period between August 29 and August 31. There is nothing in the record to indicate that he was actually without legal advice or that he endeavored to communicate with an attorney and was prevented from doing so, or that any attorney attempted to communicate with him and was prevented from doing so, or that any law enforcement officer seized upon the "lapse" in the tenure of appointed counsel to interrogate or harass defendant.

Sixth: *That the prosecution "did not sustain its burden of showing reasonable cause for the arrest on the motion to suppress evidence."*

This contention is unsound. The trial judge's ruling denying defendant's motion to suppress evidence was proper.

Prior to the trial all the defendants charged in the indictment in this case gave notice of their intention to move for an "order suppressing all evidence seized on their persons at the time of their arrest," on the ground that the arrests were illegal and, therefore, any evidence seized was inadmissible. Defendant did not file any declaration in support of the motion to suppress, but the declarations of the officers in opposition to the motion stated that a gun was taken from defendant at the time of the arrest.

The court found that the arrest was valid, either as an arrest under a warrant or, in the alternative, as an arrest based upon reasonable cause to believe that a felony had been committed.

In addition, defendant has not shown any prejudice resulting to him from the court's ruling, because none of the items in his possession (or in the possession of either of the other defendants) at the time of the arrest was admitted in evidence. Since the protested evidence was not used in the trial, the validity of the arrest becomes immaterial. (*Cf. People* v. *Valenti*, 49 Cal.2d 199, 203 [5] [316 P.2d 633].)

Seventh: *That evidence of other crimes committed*

*by defendant prior to the day of the murder was improperly admitted.*

This contention is untenable. Evidence of other crimes committed by defendant during the days just prior to the murder was clearly admissible on the issue of motive, the prosecution's case being based on the theory that defendant had premeditatedly killed Deputy Sheriff Patten in order to avoid apprehension for such crimes.

The case was tried as a murder perpetrated by the willful, deliberate and premeditated killing of a deputy sheriff.

The evidence established that in the month of August 1960 defendant was a parolee, and that between August 1 and August 15 he had stated several times he would die before he would return to prison. Thereafter, beginning on August 15, and up to the time of the murder on August 19, he engaged in a series of acts constituting violations of his parole, for which he could have been returned to prison to finish out his unexpired sentence, and, in addition, acts constituting new and separate crimes for which, if apprehended and convicted, he could be sentenced to new and additional terms in prison. As each of these criminal acts was committed, the motive to kill to escape apprehension became stronger, because the possible term in prison increased with the commission of each successive act.

Defendant says that it "cannot be logically inferred" from his planning a robbery in Redwood City on August 16 that he was guilty of murder in Ventura on August 19 over 350 miles away. Defendant has missed the whole point for which the evidence was introduced. From a logical standpoint, the planning of the robbery in Redwood City, including, as it did, the theft of a car, is perhaps the most relevant of all the acts of defendant with respect to his motive to kill, for it was at that time that his plans took concrete form. It was the turning point between just talking about killing and actually doing something irrevocable which would commit him to kill or be returned to prison.

Obviously each of the crimes which defendant committed in the four days preceding the murder and the statements made by him in connection with them were relevant on the issues of motive, intent and premeditation. Not only are such acts and statements on the part of defendant relevant and admissible from the standpoint of logic and common sense, but in cases where the victims of murders were police officers who had stopped the defendants for investigation or to arrest

them, evidence that the defendants had previously committed serious crimes has always been held properly admitted to prove that the motive for the killing was to prevent arrest and punishment for the crimes they had committed. (*People* v. *Robillard,* 55 Cal.2d 88, 100 [15] [10 Cal.Rptr. 167, 358 P.2d 295] ; *People* v. *Hall,* 220 Cal. 166, 172 [6] [30 P.2d 23, 966] ; *People* v. *Slater,* 199 Cal. 357, 359 [2] [249 P. 177] ; *People* v. *Bringhurst,* 192 Cal. 748, 751 [3] [221 P. 897].)

There is no question that the evidence of prior crimes was relevant and admissible in this case. The jury was properly instructed upon the limited purpose of such evidence.

Eighth : *That the trial court committed error in admitting his confession in evidence.*

This contention is not sound. ▮ Defendant argues that the confession was involuntary because it was made during a period of unlawful detention in Bakersfield. This argument is without merit, since, as pointed out under Second above, defendant's detention in Bakersfield was lawful. Even if the detention had been unlawful because of a delay in taking him before a magistrate, this fact alone would not render the confession inadmissible. (*Rogers* v. *Superior Court, supra,* 46 Cal.2d 3, 9 et seq.; *People* v. *Grace,* 166 Cal.App.2d 68, 72 [5a] [332 P.2d 811].)

▮ Defendant further argues that his confession was involuntary because the interrogator showed him photographs of the scene of the crime and the body of the deceased. This contention is likewise devoid of merit. The pictures were not gruesome, and the picture of the body of the deceased was the same picture which was received in evidence and shown to the jury to illustrate medical testimony. The showing of the pictures and the statements of the officers did not constitute any inducement, promise or reward, protection by the officers, or assurance of any advantage to defendant and did not serve to render the confession involuntary.

The evidence disclosed that defendant made the confession freely and voluntarily and was not threatened or coerced or offered any hope of reward. There was no evidence that it was involuntary. ▮ Furthermore, since defendant took the stand in his own behalf and repeated the essence of his confession, its voluntariness becomes unimportant. (*People* v. *Stroble, supra,* 36 Cal.2d 615, 626 [7].)

▮ Ninth : *That prejudicial error occurred by reason of references to a .38 caliber revolver acquired by defendant after the murder.*

This contention is devoid of merit, for the reason that the revolver was not received in evidence, and the references thereto were stricken and the jury admonished to disregard them.

The district attorney, although he believed the evidence was admissible, agreed during the trial not to introduce evidence relative to the revolver, and stipulated that the few brief references which had been made in the presence of the jury might be ordered stricken by the judge, and the jury admonished to disregard them.

Tenth: *That the trial court erred in permitting the district attorney to use statements made by defendant to a court-appointed psychiatrist to impeach defendant during his cross-examination.*

This contention is devoid of merit. Section 1027 of the Penal Code provides, in part: ". . . It is the duty of the alienists so selected and appointed to examine the defendant and investigate his sanity, and to testify, whenever summoned, in any proceeding in which the sanity of the defendant is in question. . . ." Defendant contends that this language means the appointed alienists cannot testify in any other type of proceeding. Such a meaning cannot be placed upon the quoted language of section 1027. Merely because the statute provides that it is the *affirmative* duty of an alienist to testify whenever summoned in a sanity proceeding does not mean or even imply that he is *prohibited* from testifying in other proceedings where information that he may have is relevant and material. Obviously, the quoted language of section 1027 does not purport to establish any physician-patient privilege of any kind.

 There is no physician-patient privilege in criminal cases. (Code of Civil Procedure, section 1881, subdivision 4, provides for the privilege in civil cases only.) Testimony is admissible concerning the results and findings of a physical examination of a defendant to which he has voluntarily submitted. (*People* v. *Guiterez,* 126 Cal.App. 526, 531 [7] [14 P.2d 838].)

 Section 1027 of the Penal Code is not unconstitutional. In response to a challenge that section 1027 compelled a defendant to incriminate himself, the court in *People* v. *Strong,* 114 Cal.App. 522, said at page 530 [4] [300 P. 84]: "We fail to see any merit in the contention that under section 1027 a defendant is compelled to be a witness against himself. Nothing in the section compels him to submit to an examina-

tion. If he does so the action is purely voluntary. To assert his constitutional rights all that is required is for him to stand mute, and possibly, also, to refuse to permit the examination, when the appointed expert undertakes to proceed; and whether he does so or not there is no compulsion.''

The impeaching matter used by the district attorney during the trial on the issue of guilt or innocence consisted of statements made by defendant to the alienist relating to the position of the gun and whether defendant said the victim was dead. These statements were at variance with statements defendant made from the witness stand. There is no legal reason why the prior contradictory statements could not be used for impeachment, and the court did not err in permitting their use.

An examination of the record discloses that defendant had a fair and impartial trial before a careful judge and a scrupulous prosecutor, who preserved defendant's rights at each stage of the proceedings.

Affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., White, J., and Dooling, J., concurred.