[Crim. No. 30124. Second Dist., Div. Four. Jan. 6, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK STEVEN SLONE, Defendant and Appellant.

612

**COUNSEL**

Weitzman, Ettinger & Fidler, Howard L. Weitzman, Warren L. Ettinger and Larry Fidler for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JEFFERSON (Bernard), J.**—By information defendant was charged with murder in violation of Penal Code section 187. Defendant entered a plea of not guilty and not guilty by reason of insanity. Pursuant to Penal Code section 1027 and Evidence Code section 730, the trial court appointed two psychiatrists to examine defendant.

Defendant, who had retained new counsel, withdrew his plea of not guilty by reason of insanity. His motion to suppress evidence, made pursuant to Penal Code section 1538.5, was heard and denied. His motion, made pursuant to Evidence Code sections 403 and 352, to exclude the testimony of Dr. Gerald Vale, a dentist and expert witness for the prosecution, was heard and denied.

Trial was by jury. Defendant was found guilty as charged. He was sentenced to state prison for the term prescribed by law. He appeals from the judgment.

At 6 a.m. on December 20, 1975, the body of a young female was discovered in the parking lot of Intercraft Industries in Carson. The police arrived and observed that the unidentified corpse was clothed only in a pair of levis and tennis shoes; her face and the bare upper part of her body were covered with a light green blanket.

Deputy Coroner Bucklin performed the autopsy. He testified at trial that death had been caused by manual strangulation. Bucklin found many areas of excoriation on the body, where skin had been removed from the victim, including a strip taken from the left chest. Bucklin formed the opinion that some type of moist heat had been applied in these areas, and that at least some of the applications had been made while the victim was still alive.

Teeth marks were found on the right anterior thigh. The deputy coroner was uncertain whether these marks had been made before or after death. There was a bruise on the right little finger and an abrasion on the back of the left ankle. The victim's jaw had been fractured on the left side.

The contents of the stomach were examined, and disclosed that a hamburger had been ingested, probably shortly before death. Also found were two pieces of green chewing gum. The blood alcohol reading was 0.11 percent.

Several days after discovery, the corpse was identified as that of 13-year-old Barbara Collins.

Much of the testimony at trial concerned Barbara's activities on December 19, 1975, the day of her death. Barbara's older teenaged brother Shean and Barbara arrived at their home in Los Alamitos about 7:30 p.m., and found their parents engaged in an argument. Both children decided to leave; Barbara, who was upset, told Shean before they parted that she was going to visit her older sister, Janice, who was married and lived some distance away. Barbara said she had a ride. However, Barbara first went to the home of the Hensons, who had a 15-year-old son, Mark, with whom Barbara was friendly. Barbara arrived there sometime between 7:30 p.m. and 8 p.m., and stayed for one half an hour. Present at the Henson home, besides Mark and his parents, were Mark's friends, Tim Armstrong and Dave Shanabarger.

Barbara and Mark left the Henson home and walked toward the house where Joe Verholtz, another teenager, lived. As they approached the Verholtz home, they met Joe. Mark then left Barbara and Joe, saying he would see them later. Barbara and Joe went on to Joe's house while Mark returned home and, with Tim and Dave, was driven by his father to a place where the boys could trampoline at 8:30 p.m. After about 45 minutes, Mark called his father to come and pick them up; he did so,

leaving Mark and his friends at Joe's house. There Barbara displayed affection for Mark, hugging him around the waist and asking him if they could get back together again; Mark had been seeing Barbara that fall, but the relationship had recently terminated. Joe made a sign to Mark behind Barbara's back indicating that he had just had sexual relations with her. Mark became angry, and slapped Barbara's face. Barbara cried and left the house.

Mark and his friends started looking for her. Mark found her outside and brought her back to Joe's house. Joe's father came home, and advised Mark to see that Barbara got home safely. Dave, Barbara and Mark left the Verholtz house at about 10 p.m. As they walked past a pool-hall-pinball establishment, "The Red Baron," Mark went in to see if he could find someone who would give Barbara a ride home. Eventually he located a friend, Robert Buck, who had access to a car and said he would take Barbara home. By this time, however, Barbara had left the area.

Janice, Barbara's older married sister, lived in an apartment complex in Stanton. Also living in the complex were Lynn and Craig Lackey. On the evening of December 19, 1975, the Lackeys were entertaining their friends, the Bowmans, and defendant.[1] The men were drinking and everyone was watching television when Barbara arrived about 10:40 p.m. Barbara announced that her sister Janice did not seem to be at home. She sat down on a sofa next to defendant and was heard to tell him about a fight she had had earlier in the evening and during the course of which she had been hit.

Barbara and defendant left the Lackey apartment about 11 p.m., after Barbara had borrowed a jacket from Lynn Lackey. Defendant told Craig Lackey he would pick up some cigarettes for him. Defendant and Barbara, however, did not return. The Lackeys never saw Barbara alive again.

Meanwhile Mark Henson and his friends had been searching for Barbara, in an effort to see that she got home safely. Mark and Robert Buck, who had obtained a car, were driving around looking for her, with Dave Shanabarger accompanying them on his bicycle. As they were trying to find the apartment of Barbara's sister, Janice, they saw Barbara coming out of the Lackey apartment with defendant. Barbara got into defendant's red Toyota; she was driving while defendant sat in the right

---

[1]The record does not disclose defendant's age. We assume he is a young adult.

front seat. As she paused to turn into traffic, Mark Henson went up to the window of the car to speak to her. She would not respond when he asked her where she was going and why she was driving. Mark noticed two green blankets on the back seat of the Toyota.

Mark and his friends followed Barbara as she drove somewhat unsteadily for several blocks to the Rainbow Liquor Store. There she and defendant entered. Mark went into the store and asked Barbara if she would like a ride home. Barbara leaned on the counter and said she had a ride home. Defendant was looking annoyed. Mark, Robert and David left. Mark arrived home about 11:20 p.m. and went to bed.

Lynn Lackey spoke with defendant on Sunday, December 21, 1975, inquiring about what had happened to him and Barbara on the night of the 19th, and why her jacket had not been returned.[2] Barbara's body had not yet been identified. Defendant told Lynn Lackey nothing.

Barbara had another older sister, Patricia. Patricia had dated defendant in 1975, until August. She called defendant on the telephone on December 22, 1975, and asked him where Barbara was. Defendant told her he had dropped Barbara off at Janice's apartment at 10:30 p.m. on December 19. Patricia then spoke to Mark Henson. On December 23, 1975, she called defendant again, insisting that he tell her where Barbara was. Patricia found it difficult to talk to defendant, who had nothing to say.

Investigating Officer Fitzgerald visited defendant at his apartment in the Silverlake district of Los Angeles on December 27, 1975. The defendant told Fitzgerald that he had dropped Barbara off at Janice's apartment on December 19, 1975, at 10:30 p.m. Defendant gave Fitzgerald permission to look in his car. There was an unopened package of Marlboro cigarettes in the glove compartment. On the floor the officer discovered a piece of light green gum and a gum wrapper. Defendant accompanied Fitzgerald to the police station where he reiterated his account of the events of December 19. He stated that after he had dropped Barbara at Janice's, he had taken the freeway home, arriving about 11:30 p.m. He had watched a movie on television, on Channel 11. The movie was in black and white, and he remembered little about it.[3]

[2]The jacket and Barbara's upper clothing were never found.

[3]An employee of the television station testified that Channel 11 showed a western movie during that time period on December 19—in color.

Defendant agreed to give the police hair samples, and casts were taken of defendant's teeth.

Criminalist Sagara testified at trial that he had removed hair from the green blanket found wrapped around Barbara's body. He compared it with hair samples taken from Mark Henson, David Shanabarger, Robert Buck, Joe Verholtz and Tim Armstrong, as well as defendant. Only the defendant's hair was found to be similar. Examination of the red Toyota revealed that there had been some type of blood on the front seat.

The gum found in defendant's car was similar to that found in the victim's stomach. Janice Hart testified that her younger sister had been fond of apple green gum, and chewed it frequently; she normally swallowed the gum instead of spitting it out. Janice also testified that she was at home after 10 p.m. on December 19, 1975, but did not see Barbara.

I

*The Admissibility of Bite Mark*
*Identification Evidence*

A major portion of the prosecution's case against defendant was the presentation of testimony from three expert witnesses, dentists, who made a positive comparison between defendant's dentition and the bite mark on Barbara Collins' thigh. We summarize this testimony in some detail because a principal issue raised on this appeal is the admissibility of the expert testimony concerning the comparison.

The first expert was Dr. Phillip Peck, a dental specialist with the Department of Medical Examiner-Coroner's Office, Los Angeles County, since 1970.[4] Dr. Peck, by dental means, has participated in over 200 identifications of victims of various types of disaster. A student of forensic dentistry, Dr. Peck has taught a course in the subject at the University of California at Los Angeles. He has a particular interest in bite mark identification, the process by which a bite mark on an individual's skin is compared with the dentition of the individual suspected of making the bite mark.

---

[4]Dr. Peck received his dental degree in 1968 from Case Western Reserve University School of Dentistry. He interned with the Veterans Administration; he has worked in public health dentistry as well as private practice.

Dr. Peck testified that the first task undertaken in the process is that of perpetuating the bite mark itself. The mark is photographed. A negative impression of the mark is then made with what Dr. Peck termed "highly accurate" material, silicone. After pouring dental stone into that impression, a positive cast or replica results.

In obtaining a replica of the suspect's dentition, a "standard dental impression technique, such as [is used] in making casts and models of patients' teeth in a dental office" is employed; an impression is taken of the teeth with silicone or alginate, dental stone is poured into the impression, and a replica of the suspect's teeth results.

Dr. Peck photographed the bite mark on the victim, and perpetuated it by the means described above. The bite itself consisted of six marks plus a brushing mark; two marks were made by upper central incisors and four marks were made by the lower incisors. Dr. Peck also made negative and positive impressions of defendant's dentition, and took the impressions of the teeth of Verholtz, Buck, Armstrong, Shanabarger and Henson, the young males who saw Barbara Collins on the night of December 19, 1975.

Cross-examination of Dr. Peck established that he had been examining bite mark evidence for two to three years prior to trial. Dr. Peck was of the opinion that the "brush mark" which appeared as part of the bite mark had been made by a left lateral incisor.

Dr. Peck was followed on the witness stand by Dr. Theodore Berg, Jr.[5] Dr. Berg, a member of the forensic odontology team utilized by the Los Angeles County Coroner's office, is interested in the emerging bite mark identification process, a process used since 1924 in Europe and Scandinavia, but only recently in the United States.

Employing slides to demonstrate the process to the jury, Dr. Berg testified as to the steps taken in making a comparison between a bite mark and an individual's dentition. First, study is undertaken of the photographs and replicas of the bite mark, and its characteristics are

---

[5] Dr. Berg graduated from dental school in 1963, having taken his undergraduate degree in zoology. He has taken advanced training in prosthodontics, a recognized specialty in dentistry which deals with the reconstruction of teeth, jaws and associated structures of the face. He also is a forensic dentist.

noted. Visual comparison is then made with the individual dentition under study. A basic effort is made to exclude or rule out a suspected person as having made the given bite mark. Wax bite analysis, involving three-dimensional investigation, is employed, as well as a visual microscopic analysis of the data.[6] Dr. Berg completed these steps. In addition, after looking through several thousand dentitions at the U.C.L.A. clinic, he studied 414 dentitions in depth and compared them with the bite mark at issue. The final step was "test biting," using the models of the suspect's teeth, to see if it would produce, on actual human skin, a similar bite mark to that found on the victim. The "human volunteer" was Dr. Berg's wife.[7]

Comparing defendant's dentition to the bite mark photographs and replicas, Dr. Berg could not exclude defendant's dentition. Further, Dr. Berg found a minimum of 10 points of significant correlation between the bite mark that was on Barbara's body and defendant's dentition. Of the 414 dentitions culled from thousands of records at the U.C.L.A. clinic, Dr. Berg found only three which had *any* points of similarity to the bite mark; he made wax impressions of these dentitions and studied them further. They were eventually ruled out.

After many hours of examination and study, Dr. Berg came to the conclusion that "it is very highly probable that the bite mark on the victim was perpetrated by the teeth belonging to the defendant." Dr. Berg thought it "[v]ery highly improbable" that some individual *other* than defendant had inflicted the bite.

On cross-examination, asked if it was possible to make a mistake in identification of a bite mark, Dr. Berg conceded that it was possible in the sense that "anything in the world is possible." He emphasized that, although there was a general variation between the models and the original mark in size (the bite mark being smaller), the variations in individual teeth were remarkably small. Dr. Berg would not rule out the possibility that somewhere on earth there might be a human being, other than defendant, who would produce from his teeth a bite mark similar to that found on the victim's body.

---

[6]Both Dr. Berg and the nationally recognized authority who followed him, Dr. Gerald L. Vale, declined to offer the results of electron microscopy, on the ground it had not yet been validated as a scientific identification technique.

[7]The results of this experiment were not offered in evidence. Part of the difficulty was that the amount of pressure used to make the original bite mark could not be duplicated on the volunteer's skin without producing permanent injury.

Dr. Gerald L. Vale, who testified at the pretrial hearing on the defense motion to exclude the prosecution's bite mark identification evidence, then was offered as a prosecution witness.[8]

By use of slides, Dr. Vale pointed out the similarities between the bite mark on the victim and the defendant's teeth. He testified that there was a "solid" fit between the two. He noted that the particular bite mark was very deep, "considerably deeper than the average bite mark"; that the arrangement of teeth in relation to each other was similar; that the width of the individual marks on Barbara Collins' skin was approximately the same as the width of defendant's teeth; and that the curvature of defendant's dentition matched that of the bite mark. Dr. Vale pointed out that one particular tooth of the defendant had an unusual configuration which appeared on the bite mark.

Dr. Vale also studied the impressions made of the teeth of Verholtz, Buck, Henson, Shanabarger and Armstrong, the other males who had seen Barbara on December 19, 1975. By the use of slides as evidentiary exhibits, Dr. Vale concluded that these individual dentitions could not be matched positively with the bite mark on the victim. He testified concerning the three most similar models found at the U.C.L.A. Dental Clinic—and pointed out their essential dissimilarity with the bite mark replica.

In the opinion of Dr. Vale, it was highly probable that the bite mark on the body of the decedent, Barbara Collins, was made by the teeth of the defendant. It was also Dr. Vale's opinion that the term "highly probable" was equatable with the term "reasonable dental certainty." The possibility of someone else having made the bite was "extremely slight." Upon cross-examination, Dr. Vale was asked about the bite mark evidence in the landmark case on this subject, *People* v. *Marx* (1975) 54

[8]Dr. Vale, described by his colleague Dr. Berg as a nationally recognized odontologist, is a dentist who took his undergraduate and graduate training at New York University. He graduated from the dental school in 1948. He received a master of dental surgery degree from the University of Southern California in 1953.

After years of private practice, he obtained a master of public health degree in 1972. He had previously earned a law degree at Southwestern University in Los Angeles in 1967, and passed the California Bar Examination.

Dr. Vale has acted as director of forensic dentistry for the Los Angeles County Coroner's office. He is an associate clinical professor at the University of Southern California School of Dentistry, has lectured widely and written articles on bite mark identification. He belongs to the usual professional organizations, is a charter member of the American Society of Forensic Odontology, and is a certified member of a new specialty branch, forensic odontology, of the American Academy of Forensic Science.

Cal.App.3d 100 [126 Cal.Rptr. 350, 77 A.L.R.3d 1108], which upheld the admissibility of bite-mark-identification evidence. Dr. Vale was involved in the *Marx* investigation, although the major expert testifying in that case was Dr. Reider Sognnaes of U.C.L.A. Dr. Vale conceded that the bite mark examined in *Marx* was deeper than that involved in the instant case.

Defendant contends that the trial court committed prejudicial and reversible error in admitting the expert bite-mark-identification evidence. This evidence identified defendant as the individual who bit the victim of the murder on the thigh. That this evidence was highly damaging to defendant is undisputed. It is the thesis of defendant that this evidence falls into the category of scientific evidence that has not yet reached the stage of reliability through acceptance by the scientific community.

The general test for determining the admissibility of a new scientific technique was enunciated in *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013, 1014 [34 A.L.R. 145] as follows: "Just when a scientific principle or discovery crosses the line between the experimental and *demonstrable* stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (Italics added.)

The *Frye* rule has been recognized in California for some time. (*Huntingdon* v. *Crowley* (1966) 64 Cal.2d 647, 653 [51 Cal.Rptr. 254, 414 P.2d 382].) In *People* v. *Kelly* (1976) 17 Cal.3d 24, 30-31 [130 Cal.Rptr. 144, 549 P.2d 1240], the California Supreme Court reaffirmed its adherence to *Frye*, terming the "essentially conservative nature" of the *Frye* test its "primary advantage," since jurors have a tendency to be overly impressed by the presentation of scientific "data." "Exercise of restraint is especially warranted when the identification technique is offered to identify the perpetrator of a crime." (*Kelly, supra,* 17 Cal.3d 24, 32.)

*Kelly* also states that the "admissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such

testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citations.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*Kelly, supra,* 17 Cal.3d 24, 30.) (Italics in original.)

The *Kelly* case held that voice-print-identification technique had not yet been sufficiently established as acceptable and reliable by the scientific community to warrant evidentiary admissibility.

In upholding the admissibility of bite mark evidence, the *Marx* court stated: "The *Frye* test finds its rational basis in the degree to which the trier of fact must accept, on faith, scientific hypotheses not capable of proof or disproof in court and not even generally accepted outside the courtroom. *Frye,* for example, involved the lie detector test in which the trier of fact is required to rely on the testimony of the polygrapher, verified at most by marks on a graph, to which the expert's hypothesis gives some relevant meaning. Similar total reliance on the expert's assumptions is required for the voice spectrogram [citation], blood tests, breathalyzer tests and radar. [Citation.]" (*Marx, supra,* 54 Cal.App.3d 100, 110.)[9]

The *Marx* court distinguished the bite mark evidentiary presentation from other scientific-test evidence, of both the admissible variety such as blood tests, breathalyzer tests and radar, and the inadmissible variety such as the lie detector test and the voice-print test, on the ground that there was a *more trustworthy* basis for admissibility of the bite-mark-identification evidence. The superior trustworthiness of the scientific bite mark approach, said *Marx,* is due to the fact that the trier of fact could see for itself, by looking at the material-object exhibits of slides, photographs, X-rays and models of the victim's bite-mark wounds, what constituted the basis for comparison with a defendant's dentition. *Marx* further noted that the [dental] experts "did not rely on untested methods, unproven hypotheses, intuition or revelation. Rather, they applied scientifically and professionally established techniques . . . to the solution of a particular problem which, though novel, was well within the capability of those techniques." (*Marx, supra,* 54 Cal.App.3d 100, 111; fns. omitted.)

---

[9]There is no reference to *Marx* in *Kelly* in the latter's discussion of the test for admitting scientific evidence. *Marx* was decided on December 29, 1975; no petition was made for a hearing before the Supreme Court. *Kelly* was decided by an opinion filed May 28, 1976.

Defendant does not seriously contend that the experts who testified were unqualified nonscientific practitioners of a new identification device involving the use of unfamiliar equipment which had not as yet been proven to be scientifically reliable. He does contend, however, that no proof was adduced that the comparison technique was scientifically reliable in the sense that individual dentition has been established as unique as, for example, fingerprints; further, defendant contends that no proof was adduced showing general acceptance of the Peck-Berg-Vale techniques by the scientific community.

■ We reject these contentions. Our analysis of the evidence in the instant case satisfies us that the bite-mark-identification evidence, admitted by the trial court, met the three-pronged test of admissibility laid down by *Kelly*. *First,* the reliability of the method was established by expert testimony. This first prong relates to the necessity of proving general acceptance by the scientific community of the particular field in which the subject belongs. We consider that the testimony of Drs. Peck, Berg and Vale established that the bite-mark-identification technique had gained general acceptance in the scientific community of dentistry—the relevant scientific community involved. *Second,* the witnesses that furnished this testimony of scientific acceptance and reliability were properly qualified as experts to express opinions on the subject. *Third,* the prosecution, as the proponent of the bite-mark-identification evidence, demonstrated that correct scientific procedures were used in this particular case before us.

There is no merit to defendant's corollary contention that by employing screening of thousands of cases at the U.C.L.A. Dental Clinic, the experts were attempting to impose mathematical probability statistics or odds on the fact-finding process, an evidentiary principle rejected by the California Supreme Court in *People* v. *Collins* (1968) 68 Cal.2d 319, 332 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176]. The experts in the instant case were simply attempting to negate the potential disapproval of their scientific method in the area of specificity—the problem posed by the defense counsel, who inquired whether the experts could testify that *no* other human being on the planet could have bit the victim on the thigh. The expert witnesses were careful to say that they could not. There is a probability factor in even the most carefully structured scientific inquiry; seldom is it possible to exclude all possible chance for error in human endeavor. But there is no requirement in our law that the admissibility of scientific-test evidence must be predicated on a 100 percent degree of accuracy.

## II

*The Trial Court's Ruling that Defendant Could Be
Impeached, if he Were To Testify, by Evidence of
his Statements to Court-appointed Psychiatrists,
there Having Been a Withdrawal of the Plea of Not
Guilty by Reason of Insanity*

Defendant contends that the trial court committed reversible error
when it ruled that, should defendant take the witness stand, he would be
subject to impeachment through the testimony of the two court-
appointed psychiatrists as to statements made to them inconsistent with
his trial testimony. Defendant asserts that this ruling kept him from
testifying in his own behalf, and was thus very prejudicial to his defense.

The record reveals that, at his arraignment on March .16, 1976,
defendant entered a plea of not guilty and not guilty by reason of
insanity. Thereafter, he was interviewed by two psychiatrists appointed
by the court pursuant to Penal Code section 1027 and Evidence Code
section 730.

It was conceded at the hearing on defendant's in-limine motion to
exclude the testimony of the interviewing psychiatrists that they had had
access to, and had utilized, the "homicide book" of police investigators
in the instant case. Included therein were some damaging statements
about the crime made by defendant to police officers on January 24,
1976, which included references to sexual activity between defendant
and the victim and a bite of the victim by defendant on the night of the
crime. The police officers were precluded from testifying to these
statements, because they were elicited from defendant after he had
requested that an attorney be present, a violation of defendant's rights
with respect to custodial interrogation set forth in *Miranda* v. *Arizona*
(1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Defense counsel asserted, at the in-limine hearing on this issue, that
the psychiatric questioning of defendant about his sexual conduct with
the victim on the night of the crime was based on the excluded
statements, and that in order to prevent secondary exploitation of the
illegally obtained evidence, the psychiatrists should not be permitted to
offer impeaching evidence. The defendant also asserted that it was the
rule in California that evidence from psychiatrists, as court-appointed
agents, could not be offered by the prosecution at all, when defendant

was not placing his mental condition in issue, having withdrawn his insanity plea. The trial court ruled that, if defendant testified, he could appropriately be impeached by the use of the psychiatrists' testimony.

On this appeal, defendant attacks the ruling as erroneous, and relies primarily on two cases, *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33] and *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272].

In *In re Spencer, supra,* which has not been overruled, the California Supreme Court held that "[i]f after submitting to an examination [a psychiatric examination], a defendant does not specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should not be permitted to testify *at the guilt trial.*" (*In re Spencer, supra,* 63 Cal.2d 400, 412.) (Italics added.)

The prosecution in the instant case made no effort to offer the psychiatric testimony as to defendant's inculpatory extrajudicial statements as part of its case in chief. At issue herein is the question of the use of psychiatric testimony for purposes of impeachment, if defendant takes the stand and gives testimony inconsistent with what he has previously related to the court-appointed psychiatrists. It was reasonably clear, prior to *Spencer,* that defendants could be impeached by such means (*People* v. *Combes* (1961) 56 Cal.2d 135, 150 [14 Cal.Rptr. 4, 363 P.2d 4] and *People* v. *Ditson* (1962) 57 Cal.2d 415, 447-448 [20 Cal.Rptr. 165, 369 P.2d 714]). But the question does not appear to have been decided subsequent to *Spencer.*

It is of significance that the *Spencer* holding is based upon a defendant's constitutional right to counsel. "Before submitting to an examination by court-appointed psychiatrists, a defendant must be represented by counsel or intelligently and knowingly have waived that right. Defendant's counsel must be informed as to the appointment of such psychiatrists." (*In re Spencer, supra,* 63 Cal.2d 400, 412.)

Defendant argues that *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], mandates, in the *Spencer* situation, a result similar to that reached in *Disbrow.* The *Disbrow* court disapproved of its previous decision in *People* v. *Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 372, 524 P.2d 844], which held that a defendant's pretrial statement to a police officer, inadmissible against defendant as an admission because of a violation of *Miranda,* could be introduced against defendant for

impeachment purposes as a prior inconsistent statement in the event a defendant testified as a witness.

The *Disbrow* holding is based upon the self-incrimination privilege provided by article I, section 15 of the California Constitution. The *Disbrow* court held that the prosecution is precluded from using any extrajudicial statement of a defendant, whether inculpatory or exculpatory, if obtained during custodial interrogation in violation of *Miranda*. The *Nudd* court had followed *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], in holding that the federal constitutional principles embodied in *Miranda* did not preclude a state court from using a criminal defendant's statement obtained in violation of *Miranda* to attack defendant's credibility as a witness. In rejecting *Harris* and disapproving *Nudd, Disbrow* relies on state constitutional grounds and interprets the California Constitution's privilege against self-incrimination in a broader fashion than the United States Supreme Court interprets the same privilege under the federal Constitution.

Although *Disbrow* was decided subsequent to *Spencer,* no mention was made in *Disbrow* concerning whether the *Spencer* situation would be governed by the *Disbrow* rationale. Nor did *Disbrow* refer to *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024], in which the court created a judicial rule of evidence exclusion which made the testimony of a probationer at a probation revocation hearing, held prior to the disposition of criminal charges arising out of the alleged violation of the conditions of his probation, inadmissible against the probationer during subsequent proceedings on the related criminal charges. But the *Coleman* court stated that the prior testimony of defendant probationer would be admissible for impeachment or rebuttal purposes if the probationer-defendant testifies at his criminal trial so as to make his probation revocation hearing testimony relevant as prior inconsistent statements or rebuttable evidence.

We note also that in *Disbrow,* the court, because of the value that must be placed upon constitutional rights, considered that the use of a defendant's statements for impeachment purposes would, for all practical purposes, result in a possible substantive use of such statements by the trier of fact, thus denigrating the defendant's constitutional right.

Thus, the *Disbrow* court stated: "However, our principal objection to the *Harris-Nudd* rule lies in the considerable potential that a jury, even with the benefit of a limiting instruction, will view prior inculpatory

statements as substantive evidence of guilt rather than as merely reflecting on the declarant's veracity. The theory of a limiting instruction loses meaning in this context. It is to be recalled that we are here dealing with extrajudicial *inculpatory* admissions. To instruct a jury that they are not to consider expressions of complicity in the charged crime as evidence that the speaker in fact committed the charged crime, but only for the purpose of demonstrating that he was probably lying when he denied committing the charged crime, would be to require, in the words of Learned Hand, 'a mental gymnastic which is beyond, not only [the jury's] power, but anybody else's.' (*Nash* v. *United States* (2d Cir. 1932) 54 F.2d 1006, 1007.)" (*Disbrow, supra,* 16 Cal.3d 101, 112.) (Italics in original.)

██ Because the *Spencer* exclusionary rule that excludes a defendant's statements made to court-appointed psychiatrists is founded upon a defendant's constitutional right to counsel, we conclude that the *Disbrow* principle applies, and the testimony of psychiatrists as to statements made to them by the defendant during psychiatric examinations, conducted pursuant to the provisions of Penal Code section 1027, is inadmissible against defendant at a guilt trial for the *rebuttal* purpose of impeaching the defendant as a witness, in addition to being inadmissible as a part of the People's case in chief.

## III

*Dr. Berg's Testimony that he was Certain*
*Beyond a Reasonable Doubt that Defendant*
*had Placed the Bite Mark on the Victim*

Defendant asserts that the trial court erred in not granting defendant's motion for a mistrial, made after examination, both direct and cross, had been completed of one of the dental experts, Dr. Berg. Dr. Berg had testified on direct examination, without objection, that he was certain "beyond a reasonable doubt" that it was defendant's teeth that had caused the bite mark on the victim's thigh. After the defense counsel had commenced cross-examination of Dr. Berg by asking him to define "beyond a reasonable doubt," the prosecutor objected to the line of questioning on the ground that it was immaterial and called for a legal conclusion by the witness. At this point the trial judge admonished the jury to disregard Dr. Berg's description of his certainty as being "beyond a reasonable doubt." The trial judge also properly informed the jury that it was exclusively within their province to determine whether the

evidence established such certainty and that the term had a legal meaning with which ordinary people were only generally familiar. Subsequently, in chambers, defense counsel moved for a mistrial, which the trial judge denied.

■ The denial of the motion for a mistrial was proper. Dr. Berg's choice of words was the equivalent of the expert Felando's description of certainty in *Marx,* i.e., "without a doubt." While it is improper for experts to express opinions in terms of legal conclusions, because their expertise does not qualify them generally to express such conclusions, we assume that the jury understood the admonition of the trial judge, and reached their own finding concerning the evidence presented to them relative to the bite marks.

## IV

### *Defendant's Motion To Suppress Evidence*

■ Defendant contends that his motion to suppress evidence, made pursuant to Penal Code section 1538.5, should have been granted. He argues that the record shows that he indicated his desire to talk to an attorney before providing samples of his dentition to the police, and, being told that the police would seek a search warrant if he did not agree to give the samples, defendant agreed to do so. At no time was defendant coerced or misled about the situation; he was specifically informed that a magistrate would make the ultimate decision about the issuance of a warrant, and that it was solely up to the magistrate as to what the decision would be. ■ All the inferences from the suppression hearing testimony must be viewed as favorably as possible to the determination made. (*People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

■ It is undisputed that defendant agreed voluntarily to cooperate with the investigating authorities. It is contended by defendant that the law "is by no means certain or settled" that a suspect may not refuse a request for samples of his dentition until he has consulted counsel. On the contrary, the law is settled that a defendant may voluntarily cooperate with the police, and that, if a search warrant is obtained, he has "no right to refuse to submit to the tests ordered in the search warrant." (*Marx, supra,* 54 Cal.App.3d 100, 113.) It was not error, therefore, for the trial court to deny the motion to suppress evidence.

## V

### *Inadmissibility of Evidence that Blood of Some Kind Was Found in Defendant's Car*

Defendant contends that the trial court erred in not granting his motion to strike the testimony of criminalist Sagara with reference to the finding of a blood stain on the seat of defendant's red Toyota automobile. The testimony of Sagara was to the effect that, in the latter part of January 1976, he tested a stain found on the seat of defendant's Toyota automobile and that the stain contained blood, but that he was unable to determine whether or not it was human blood or how long it had been there. In closing argument the prosecutor stated: "It [the blood stain] had been existing there since the evening of the 19th and 20th of December 1975, when the defendant was driving to 771 East Watson Center Road for the purpose of disposing of the remains of his 13-year-old victim."

The Attorney General argues that the presence of blood in the defendant's automobile was "a part of the mosiac [*sic*] of circumstantial evidence and added to the other evidence brought before the jury was quite relevant." In denying defendant's motion to strike, the trial court considered that the evidence was relevant and that its relevancy was not outweighed by any likelihood of undue prejudice to defendant. It is clear from the prosecutor's argument that he desired the jury to draw an inference that the blood stain had been present on the date the victim had been killed and that it was the blood of the victim.

██ The trial judge's denial of defendant's motion to strike criminalist Sagara's testimony was error. The blood stain evidence was simply irrelevant. In the light of logic, reason and experience, this evidence had no tendency to prove that defendant killed the victim. This evidence thus failed to meet the definition of relevant evidence set forth in Evidence Code section 210. Furthermore, if evidence is irrelevant, it must be excluded. The trial judge has no discretion to admit irrelevant evidence. "No evidence is admissible *except* relevant evidence." (Evid. Code, § 350.) (Italics added.) That the admissibility of the blood stain evidence was prejudicially devastating to defendant is apparent. The prosecutor's argument deftly but unmistakably asked the jury to find that the blood

stain constituted not only human blood but the blood of the victim, Barbara Collins, in spite of the fact that there was not a scintilla of evidence to justify such an inference. The record indicates that defendant made no objection to the prosecutor's argument. But the prosecutor's argument was a fair comment once the trial judge had ruled that the blood stain evidence was relevant and admissible. An objection by defendant to the prosecutor's argument would have been futile.

## VI

### The Admissibility of Gruesome Photographs of the Victim's Body on the Issue of Murder by Torture

■ Defendant complains that the trial court committed an abuse of discretion in violation of Evidence Code section 352 in admitting into evidence certain admittedly gruesome photographs of the victim's body. These photographs graphically depicted the condition of Barbara Collins' body, photographs which particularly emphasized the peculiar areas where the victim's skin had been removed. The trial court excluded one photograph of the face, but admitted the four other photographs which showed other parts of the body in an excoriated condition. In introducing the photographs, the People argued that they were relevant on the issue of murder by torture.

In the case at bench, the evidence offered by the prosecution established that the victim's skin had been removed from her body in numerous areas, including a large strip taken from the left breast area. No definitive explanation was offered by the deputy coroner as to how these excoriations took place, except that he was of the opinion that moist heat had been applied to the victim's skin and that some of the applications had been made while the victim was alive. There was also evidence of a jaw fracture, bruises, and bite marks on the thigh. The photographs were relevant on the issue of murder by torture. We have examined the photographs admitted in evidence. Although they are not pleasant to see, we cannot conclude that the trial judge abused his discretion in refusing to exclude the photographs pursuant to Evidence Code section 352. The trial judge could properly find that the probative value of this evidence was *not* substantially outweighed by a danger of undue prejudice to defendant.

# VII

## *The Propriety of Jury Instructions on the Issue of Murder by Torture*

 Defendant contends that it was error for the trial court to instruct the jury on the theory of murder by torture.

 It is well settled that the trial court must " 'instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

 In *People* v. *Steger* (1976) 16 Cal.3d 539 [128 Cal.Rptr. 161, 546 P.2d 665]; the California Supreme Court held that for there to be evidence of murder by torture, there must be a showing of willful, deliberate and premeditated intent to inflict intense and prolonged pain. We think that the evidence in the case at bench was sufficient to justify the instruction on the murder by torture theory as both the expert testimony and the physical evidence demonstrated that, for reasons unclear, to satisfy some type of propensity, the victim was subjected to highly unusual and cruel procedures.

# VIII

## *The Question of the Prejudicial Effect of the Errors*

 In the case at bench the evidence against defendant was entirely circumstantial. Because of the trial court's erroneous ruling on the admissibility of the testimony of psychiatrists to impeach the defendant if he testified, the defendant chose not to take the witness stand. The jury was thus deprived of the testimony of defendant—direct evidence testimony as to innocence to be weighed against the circumstantial evidence pointing to defendant's guilt. In addition, the trial court admitted against defendant the utterly speculative, irrelevant and highly prejudicial blood-stain evidence through the testimony of criminalist Sagara. Although defendant is not entitled to a completely errorless trial, he is entitled to a trial on "relevant, nonprejudicial evidence." (*People* v. *Guerrero* (1976) 16 Cal.3d 719, 730 [129 Cal.Rptr. 166, 548 P.2d 366].)

Our review of the entire record convinces us—not only that it has not been established that the errors discussed herein are nonprejudicial beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]), but that it is reasonably probable that a result more favorable to defendant would have been reached in the absence of these errors. (*People* v. *Duran* (1976) 16 Cal.3d 282, 296 [127 Cal.Rptr. 618, 545 P.2d 1322]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is reversed.

Files, P. J., and Kingsley, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 2, 1978. Clark, J., was of the opinion that the petition should be granted.